1

**LYNCH CARPENTER, LLP**
Todd D. Carpenter, (SBN 234464)

2

todd@lcllp.com
1234 Camino del Mar

3

Del Mar, CA 92014
Tel: 619-762-1910

4

Fax: 619-756-6991

5

*Counsel for Plaintiffs and the Putative Class*

6

[Additional counsel appearance on signature page]

7

8

9

**UNITED STATES DISTRICT COURT**

10

**SOUTHERN DISTRICT OF CALIFORNIA**

11

INDIA PRICE, ERICA MIKULSKY,

12

MARILYN HERNANDEZ, DANIEL RUBRIDGE, and ARIEL OLIVER,

13

individually and on behalf of all others similarly situated,

14

15

Plaintiffs,

16

17

v.

18

CARNIVAL CORPORATION,

19

Defendant.

20

Case No. 3:23-cv-00236-GPC-MSB

**CONSOLIDATED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

21

     Plaintiffs India Price, Erica Mikulsky, Marilyn Hernandez, Daniel Rubridge, and

22

Ariel Oliver ("Plaintiffs"), individually and on behalf of all others similarly situated,

23

hereby file this consolidated class action complaint against Defendant Carnival

24

Corporation ("Defendant" or "Carnival"), and in support thereof allege the following:

25

**<u>INTRODUCTION</u>**

26

     1.     This is a class action brought against Carnival for wiretapping the

27

electronic communications of visitors to its website, www.carnival.com. Carnival

28

procures third-party vendors, such as Microsoft Corporation, to embed snippets of

JavaScript computer code ("Session Replay Code") on Carnival's website, which then deploys on each website visitor's internet browser for the purpose of intercepting and recording the website visitor's electronic communications with the Carnival website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box whether submitted or not), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications"). Carnival deploys and/or directs third-party vendors (collectively, "Session Replay Providers") to create and deploy the Session Replay Code on Carnival's website.

2.     After intercepting and capturing the Website Communications, Carnival and the Session Replay Providers can use those Website Communications to recreate website visitors' entire visit to www.carnival.com. Session Replay Providers can create a video replay of the user's behavior on the website and provide it to Carnival for analysis.  Both Carnival and the Session Replay Providers can access and analyze the video replay of the user's behavior on the website. Carnival's secret deployment of the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to the Carnival's website for the entire duration of their website interaction.

3.     As set forth more particularly below, Carnival's conduct violates the federal Wiretap Act, 18 U.S. C. § 2510, *et seq*. ("Wiretap Act"), and violates multiple state laws in California, Maryland, Massachusetts, and Pennsylvania.

4.     Plaintiffs bring this action individually and on behalf of a nationwide class and state subclasses consisting of all persons in California ("California Class"), Maryland ("Maryland Class"), Massachusetts ("Massachusetts Class"), and Pennsylvania ("Pennsylvania Class") (collectively, "Classes") whose Website Communications were intercepted by Carnival and Session Replay Providers through Carnival's procurement, deployment, and use of Session Replay Code embedded on the webpages of www.carnival.com and seek all civil remedies provided under the

causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

5.      Plaintiff India Price is a citizen of the State of California, and at all times relevant to this action, resided and was domiciled in California. Plaintiff currently resides and is domiciled in California. While on Defendant's website, Price used her mouse to hover and click on certain links and items, and input information about potential trips she was planning.

6.      Plaintiff Erica Mikulsky is a citizen of the State of California, and at all times relevant to this action, resided and was domiciled in California. Plaintiff currently resides and is domiciled in California. While on Carnival's website, Plaintiff Mikulsky recalls providing personal information pertaining to booking a cruise, including passport numbers, her children's names, and birthdays.

7.      Plaintiff Marilyn Hernandez is a citizen of the State of Maryland, and at all relevant to this action, resided and was domiciled in Maryland. Plaintiff currently resides and is domiciled in Maryland.

8.      Plaintiff Daniel Rubridge is a citizen of the Commonwealth of Massachusetts, and at all times relevant to this action, resided and was domiciled in Massachusetts. Plaintiff currently resides and is domiciled in Massachusetts. While on Carnival's website, Plaintiff Rubridge recalls requesting and submitting information related to price ranges for specific trips, date ranges for specific trips, and inquiries related to cabin and ship details (including the pricing and size of cabins), amenities, and services.  Plaintiff Rubridge did some general browsing during which he believes he provided additional personal information to Carnival, including his name, phone number, email address, trips that interested him, and departing port information.

9.      Plaintiff Ariel Oliver is a citizen of the Commonwealth of Pennsylvania and, at all times relevant to this action, resided and was domiciled in Pennsylvania. Plaintiff currently resides and is domiciled in Pennsylvania.  While on Defendant's

website, Oliver browsed through cruise packages and researched different destinations, hovering over and clicking on links and items embedded on the website.

10.    Defendant Carnival Corporation is a corporation organized under the laws of Panama, and its principal place of business is in Miami, Florida. Defendant is a citizen of Florida.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of each proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of each proposed class, and at least one member of each proposed class, including Plaintiffs, is a citizen of a state different than Defendant.

12.    This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to the Plaintiffs' claims occurred in California. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of California, while they were located within California. At all relevant times, Defendant knew that its practices would directly result in collection of information from California citizens while those citizens browse www.carnival.com. Defendant chose to avail itself of the business opportunities of marketing and selling its goods and services in California and collecting real-time data from website visit sessions initiated by California citizens while located in California, and the claims alleged herein arise from those activities.[1]

13.    Carnival also knows that many users visit and interact with Carnival's website while they are physically present in California by the user's IP address (*i.e.*, without requiring the user to manually input an address). This means Carnival is continuously made aware that its website is being visited by people located in

---

[1] Defendant consented and agreed to the transfer of individual actions, originally filed in the districts of Maryland, Massachusetts, and the Western District of Pennsylvania to the Southern District of California, and as such, has conceded that personal jurisdiction in this Court is proper.

California, and that such website visitors are being wiretapped in California and in violation of California statutory and common law as well as federal statutory law.

14.     Carnival's deliberate and continuous exploitation of the California market further supports personal jurisdiction in California. Carnival generates revenue from California residents and from its seaports located in California and maintains employees in California. Carnival has physical seaports operating from California shores, including ports in San Francisco, California and Long Beach (Los Angeles), California.[2]   For the 2024 calendar year, Carnival is currently offering 42 different cruise options leaving from a California port, many of which are offered multiple times throughout 2024.[3]   The cruise ships leaving California ports each hold between 2,124 and 4,126 guests. [4]

15.     Carnival is registered to do business in California with a registered agent located at 330 N. Brand Blvd., Glendale, California.

16.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.   Defendant has also consented to litigation of this consolidated case, which includes Plaintiffs from California, Maryland, Massachusetts, and Pennsylvania, in the Southern District of California.

## FACTUAL ALLEGATIONS

### A.     Website User and Usage Data Have Immense Economic Value.

17.     The "world's most valuable resource is no longer oil, but data."[5]

18.     Last year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs),

---

[2] https://www.carnival.com/cruise-to.aspx ("Sail To" and "Sail From" ports both offer California options).

[3] https://www.carnival.com/cruise-search?pageNumber=6&numadults=2&port=LAX, SFO&dates=012024,022024,032024,042024,052024,062024,072024,082024,092024, 102024,112024,122024&pagesize=8&sort=fromprice&showBest=true.

[4] https://www.carnival.com/cruise-ships/compare-cruise-ships.

[5] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017),      https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[6] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[7]

19.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[8]

20.     In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[9] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[10]

21.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [\$2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination

---

[6] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.
[7] *Id.*
[8] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.
[9] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[10] *Id.* at 25.

1 | of address, date of birth, social security number, credit record and military is estimated
2 | to cost USD 55."[11]

3 | **B.    Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**
4 |

5 | 22.    Consumers are skeptical and wary about their data being collected. A
6 | report released by KPMG shows that "a full 86% of the respondents said they feel a
7 | growing concern about data privacy, while 78% expressed fears about the amount of
8 | data being collected."[12]

9 | 23.    Another recent paper also indicates that most website visitors will assume
10 | their detailed interactions with a website will only be used by the website and not be
11 | shared with a party they know nothing about.[13] As such, website visitors reasonably
12 | expect that their interactions with a website would not be released to third parties unless
13 | explicitly stated.[14]

14 | 24.    Privacy polls and studies show that a majority of Americans consider one
15 | of the most important privacy rights to be the need for an individual's affirmative
16 | consent before a company collects and shares its customers' data.

17 | 25.    A recent study by Consumer Reports shows that 92% of Americans
18 | believe that internet companies and websites should be required to obtain consent
19 | before selling or sharing consumers' data, and the same percentage believe internet
20 | companies and websites should be required to provide consumers with a complete list
21 | of the data that has been collected about them.[15]

22 |

---

[11] *Id.*
[12] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.
[13] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.
[14] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).
[15] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/

26.    Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[16]

27.    Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[17]

**C.    How Session Replay Code Works.**

28.    Session Replay Code, such as that implemented on www.carnival.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[18]

29.    Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[19] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[20]

---

consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

[16] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confused-and-feeling-lack-of-control-over-their-personal-information/.

[17] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[18] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

[19] *Id.*

[20] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

30.     Session Replay Code works by inserting computer code onto each website user's electronic device and into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser on the user's own electronic device, the browser follows the code's instructions by sending responses in the form of "event" data to a designated server. When Carnival deployed the Session Replay Code, the Session Replay Provider's server received the event data and thus, the server receiving the event data was controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code was installed.

31.     The types of events captured by Session Replay Code are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry (even if deleted), and numerous other forms of a user's navigation and interaction through the website and can include swaths of user data. To permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the duration of the user's website session, rather than after the user's visit to the website is completely finished.  Thus, the transmission of a website user's Website Communications to the third-party Session Replay provider, which starts immediately upon the navigation to the website, happens contemporaneously in real-time.

32.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

33.     Once the events from a user session have been recorded by Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical

1  analytics services that provide aggregate statistics, these scripts are intended for the
2  recording and playback of individual browsing sessions."[21]

3  34.    Because most Session Replay Code will by default indiscriminately
4  capture the maximum range of user-initiated events and content displayed by the
5  website, researchers have found that a variety of highly sensitive information can be
6  captured in event responses from website visitors, including medical conditions, credit
7  card details, and other personal information displayed or entered on webpages.[22]

8  35.    Most alarming, Session Replay Code captures data that the user did not
9  even intentionally transmit to a website during a visit, and then makes that data
10 available to website owners when they access the session replay through the Session
11 Replay Provider. For example, if a user writes information into a text form field, but
12 then chooses not to click a "submit" or "enter" button on the website, the Session
13 Replay Code may nevertheless cause the non-submitted text to be sent to the designated
14 event-response-receiving server before the user deletes the text or leaves the page. This
15 information is then viewable to the website owner, including when accessing the
16 session replay through the Session Replay Provider.

17 36.    Session Replay Code does not necessarily anonymize user sessions,
18 either, and upon information and belief Carnival's use of the code is no different.

19 37.    First, if a user's entry of personally identifying information is captured in
20 an event response, that data will become known and visible to both the Session Replay
21 Provider and the website owner.

22 38.    Second, if a website displays user account information to a logged-in user,
23 that content may be captured by Session Replay Code.

24 39.    Third, some Session Replay Providers explicitly offer website owners
25 cookie functionality that permits linking a session to an identified user, who may be

26

27  _____
28  [21] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[22] *Id.*

1    personally identified if the website owner has associated the user with an email address

2    or username.[23]

3        40.   Session Replay Providers often create "fingerprints" that are unique to a

4    particular user's combination of computer and browser settings, screen configuration,

5    and other detectable information. The resulting fingerprint, which is often unique to a

6    user and rarely changes, are collected across all sites that the Session Replay Provider

7    monitors.

8        41.   When a user eventually identifies themselves to one of these websites

9    (such as by filling in a form), the website owner can then associate the fingerprint with

10   the user identity and can then back-reference all of that user's web browsing across

11   other websites previously visited, including on websites where the user had intended

12   to remain anonymous—even if the user explicitly indicated that they would like to

13   remain anonymous by enabling private browsing.

14       42.   In addition to the privacy invasions caused by the diversion of user

15   communications with websites to third-party Session Replay Providers, Session Replay

16   Code also exposes website visitors to identity theft, online scams, and other privacy

17   threats.[24] Indeed, "[t]he more copies of sensitive information that exist, the broader the

18   attack surface, and when data is being collected [ ] it may not be stored properly or

19   have standard protections" increasing "the overall risk that data will someday publicly

20   leak or be breached."[25]

21       43.   The privacy concerns arising from Session Replay Code are not

22   theoretical or imagined. The CEO and founder of LOKKER, a provider of data privacy

23   and compliance solutions has said "[consumers] should be concerned" about the use of

24   Session Replay Code because "they won't know these tools are operating 'behind the

25   ――――――――――――――

26   [23] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Aug. 7, 2023).

27   [24] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

28   [25] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

scenes' of their site visit" and "even if the company disclosed that they are using these tools, consumers wouldn't likely be able to opt-out and still use the site."[26]

44.    Indeed, the news is replete with examples of the dangers of Session Replay Code. For example, in 2019, the App Analyst, a mobile expert who writes about his analyses of popular apps, found that Air Canada's iPhone app wasn't properly masking the session replays they were sent, exposing unencrypted credit card data and password information.[27] This discovery was made just weeks after Air Canada said its app had a data breach, exposing 20,000 profiles.[28]

45.    Further, multiple companies have removed Session Replay Code from their websites once it was discovered the Session Replay Code captured highly sensitive information. For instance, in 2017, Walgreens stopped sharing data with a Session Replay Provider after it was discovered that the Session Replay provider gained access to website visitors' sensitive information.[29] Indeed, despite Walgreens' extensive use of manual redactions for displayed and inputted data, the Session Replay Provider still gained access to full names of website visitors, their medical conditions, and their prescriptions.[30]

46.    Following the Walgreens incident, Bonobos, a men's clothing retailer, announced that it was eliminating data sharing with a Session Replay Provider after it was discovered that the Session Replay Provider captured credit card details, including the cardholder's name and billing address, and the card's number, expiration, and security code from the Bonobos' website.[31]

---

[26] Mark Huffner, *Is 'session replay software' a privacy threat or just improving your web experience*, Consumer Affairs (Oct. 25, 2022), https://www.consumeraffairs.com/news/is-session-replay-software-a-privacy-threat-or-just-improving-your-web-experience-102522.html.
[27] Zach Whittaker, *Many Popular iPhone Apps Secretly Record Your Screen Without Asking*, TechCrunch (Feb. 6, 2019), https://techcrunch.com/2019/02/06/iphone-session-replay-screenshots/.
[28] *Id.*
[29] Nitasha Tiku, *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, WIRED (Nov. 16, 2017), https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.
[30] Englehardt, *supra* note 21.
[31] Tiku, *supra* note 29.

47.     Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[32] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[33]

**D.     Carnival Secretly Wiretaps its Website Visitors' Electronic Communications.**

48.     Carnival operates the website www.carnival.com. Carnival is a cruise line that offers cruise vacations throughout the United States and internationally.

49.     However, unbeknownst to the millions of individuals perusing Carnival's products and services online, Carnival intentionally procures and embeds Session Replay Code from various Session Replay Providers on its website to track and analyze website user interactions with www.carnival.com.

50.     Microsoft is one such Session Replay Provider from which Carnival procures Session Replay Code.

51.     Microsoft is the owner and operator of Session Replay Code called Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, country, and other dimensions.[34]

52.     Clarity captures a user's interactions with a website, logging every website user's mouse movements and clicks, scrolling window resizing, user inputs, and more.[35] Indeed, Clarity organizes the information it captures into over 30 different

---

[32] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.
[33] *Id.*
[34] Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Aug. 7, 2023).
[35] *Clarity Data Collection*, Microsoft, https://docs.microsoft.com/en-us/clarity/clarity-data, (last visited Aug. 7, 2023).

categories including: the date a user visited the website, the device the user accessed the website on, the type of browser the user accessed the website on, the operating system of the device used to access the website, the country where the user accessed the website from, a user's mouse movements, a user's screen swipes, text inputted by the user on the website, and how far down a webpage a user scrolls.[36] Clarity even provides a specific user ID to each website visitor so their website use and interactions can be monitored over time. [37]

53.   Similar to other Session Replay Code, the information collected and recorded by Clarity can then be used to play back a user's entire journey through a website, showing how they interacted with site navigation, calls to action, search features, and other on-page elements.[38] Put differently, the information Clarity captures can be translated into a simulation video of how a user interacts with a website.

54.   Clarity also uses the information captured to create detailed heatmaps of a website that provide information about which elements of a website have high user engagement, how far website users scrolled on the website, and the total clicks within a given area on the website. [39]

55.   Clarity offers websites three standard approaches when it comes to masking sensitive information collected from a user's interactions with a website—strict (all text entered by a user is purportedly masked), balanced (sensitive text entered into certain specifically pre-coded fields, such as passwords, and credit card information, is masked), and relaxed (no text entered by a user is masked).[40] When Clarity is set to "relaxed," whatever information a user enters into the field on a website

---

[36] *Filters Overview*, Microsoft (Jul. 26, 2022), https://docs.microsoft.com/en-us/clarity/clarity-filters.
[37] *Id.*
[38] Roger Montti, *Microsoft Clarity Analytics: Everything You Need to Know*, SEJ (Jan. 19, 2022), https://www.searchenginejournal.com/microsoft-clarity-analytics-overview/419311/#close.
[39] Haley Walden, *What is Microsoft Clarity? (& How Can it Improve SEO?)*, Elegant Themes (Jun. 12, 2022), https://www.elegantthemes.com/blog/wordpress/microsoft-clarity-improve-seo.
[40] *Microsoft Clarity, An Essential Part of Customer Experience Optimization*, TechAir (Aug. 17, 2022), https://privacy.microsoft.com/en-US/privacystatement.

can be previewed in session recordings.[41] Additionally, Clarity enables websites to select specific elements and content to mask or unmask, customizing the standard masking approaches.[42]

56. However, even when a website operator selects the "strict" and "balanced" settings, Clarity is nevertheless capable of collecting text entered by users, including text containing sensitive information.

57. As such, Clarity collects highly personal information and substantive communications that can be tied directly to a website user's identity as it monitors, records, and collects a website user's every move.

58. In order for Clarity to capture website visitors' interactions with a website, Clarity's JavaScript must be embedded in the website, either by directly hard-coding the code on the website or through a third-party platform, such as Google Tag Manager.[43] Clarity is embedded in a website by adding its JavaScript code into the HyperText Markup Language (HTML) used on the website. As with all HTML code, Clarity is not visible to a user who is navigating a webpage through a standard browser's default view because by design a browser interprets HTML, without showing it, in order to render a more user-friendly display that is the designer's intended presentation of the website to a visitor.

59. Clarity is identifiable only through the use of advanced technical tools that show underlying HTML, such as "developer tools." Developer tools are intended for website programmers, and are generally not meaningful or comprehensible to those without a technical background in web development or computer science.

60. Once Clarity's JavaScript is installed on a website, Clarity begins collecting website users' interactions.[44] For website users who visit a website after

---

[41] *Id.*
[42] *Masking Content*, Microsoft (Jul. 18, 2022), https://docs.microsoft.com/en-us/clarity/clarity-masking.
[43] *Masking Content*, Microsoft (Jul. 18, 2022), https://docs.microsoft.com/en-us/clarity/clarity-masking.
[44] *Frequently Asked Questions*, Microsoft, https://docs.microsoft.com/en-us/clarity/faq, (last visited Aug. 24, 2022).

Clarity has been installed, the wiretapping commences immediately on the visitor's web browser when the visitor loads the website in their browser.

61.    Data collected by Clarity is then stored in the Microsoft Azure cloud service and Microsoft has access to that information and can use that information to recreate a website users' session via a video playback. [45]

62.    Upon information and belief, Carnival also procures Session Replay Code from ContentSquare.[46]

63.    Carnival's procurement and use of Microsoft Clarity's and ContentSquare's Session Replay Code, and procurement and use of other Session Replay Code through various Session Replay Providers, is a wiretap in violation of the Electronic Communications Privacy Act, § 2510, *et seq.,* and the statutory and common laws of California, Maryland, Massachusetts, and Pennsylvania.

**E.    Plaintiffs' and Class Members' Experience.**

64.    Plaintiffs visited www.carnival.com and certain of its subpages on their computers and/or smartphones while in their home states or commonwealths.

65.    While visiting Carnival's website, Plaintiffs fell victim to Defendant's unlawful monitoring, recording, and collection of Plaintiffs' Website Communications with www.carnival.com.

66.    Unknown to Plaintiffs, Carnival procures and embeds Session Replay Code on its website.

67.    During visits by Plaintiffs to www.carnival.com and its subpages, Plaintiffs browsed for cruise packages and different destinations. Plaintiffs communicated with Carnival's website by using their mouse to hover and click on certain links and items, and inputting personal information and information about potential trips they were researching or planning.

68.    The Session Replay Code instantaneously captured Plaintiffs' Website Communications throughout their visits. Indeed, through Carnival's deployment of

---

[45] *Id.*
[46] https://contentsquare.com/product/capabilities/session-replay/.

Session Replay Code, Plaintiffs' Website Communications were automatically and secretly intercepted while using Carnival's website.

69.     Further, without their consent, Carnival procured Session Replay Providers and deployed Session Replay Code to obtain certain information about users' devices and browsers and create unique IDs and profiles for them.

70.     Session Replay Code operates in the same manner for all putative Class members.

71.     Like Plaintiffs, each Class member visited www.carnival.com and its subpages with Session Replay Code embedded in it, and that Session Replay Code intercepted the Class members' Website Communications with www.carnival.com by sending hyper-frequent logs of those communications to Carnival and/or Session Replay Providers.

72.     Even if Carnival masks certain elements when it configured the settings of the Session Replay Code embedded in its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

73.     For example, even with heightened masking enabled, Carnival and/or Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class and State Subclasses:

*Nationwide Class*

All natural persons in the United States whose Website Communications were captured in the United States through the use of Session Replay Code embedded in www.carnival.com.

*California Class*

All natural persons in California whose Website Communications were captured in California through the use of Session Replay Code embedded in www.carnival.com.

- 17 -

*Maryland Class*

All natural persons in Maryland whose Website Communications were captured in Maryland through the use of Session Replay Code embedded in www.carnival.com.

*Massachusetts Class*

All natural persons in Massachusetts whose Website Communications were captured in Massachusetts through the use of Session Replay Code embedded in www.carnival.com.

*Pennsylvania Class*

All natural persons in Pennsylvania whose Website Communications were captured in Pennsylvania through the use of Session Replay Code embedded in www.carnival.com.

75.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Classes, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

76.     **Numerosity:** The members of each Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Carnival or the Session Replay Providers.

77.     **Commonality:** This action involves questions of law and fact that are common to members of all Classes. Such common questions include, but are not limited to: (a) whether Defendant procures Session Replay Providers to intercept Carnival's website visitors' Website Communications; (b) whether Carnival intentionally discloses the intercepted Website Communications of its website users; (c) whether Carnival acquires the contents of website users' Website Communications without their consent; (d) whether Defendant's conduct violates the federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*; and (e) whether Plaintiffs and Class members are entitled to equitable relief. Additionally, there are questions of law and fact that are common to members of each Class, including whether Defendant's conduct respectively violates

the Wiretap Act and the statutory and common laws of California, Maryland, Massachusetts, and Pennsylvania, as alleged *infra*.

78. **Typicality:** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiffs and all Class members had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiffs and the Class members typical of one another.

79. **Adequacy of Representation:** Plaintiffs have and will continue to represent and protect the interests of the Classes fairly and adequately. Plaintiffs have retained competent counsel experienced in complex litigation and class actions, including litigation to remedy privacy violations. Plaintiffs have no interests that are antagonistic to the interests of other Class members, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class members, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to the interests of other Class members.

80. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

81. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that

dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and members of each Class. If Defendant intercepted Plaintiffs' and Class members' Website Communications, then Plaintiffs and each Class member suffered damages by that conduct.

82. **Ascertainability:** Members of the Classes are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Carnival's books and records or the Session Replay Providers' books and records.

**COUNT I**
**VIOLATION OF FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, *et. seq.***
**(on behalf of the Nationwide Class)**

83. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

84. Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

85. The Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986, prohibits the intentional interception or attempted interception of any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

86. The Wiretap Act further provides that any person who:

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection:

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1)(c) & (d).

87. The transmission of Plaintiffs' and the Class members' Website Communications violates the Wiretap Act.

88.     The transmission from Plaintiffs and the Class members to Defendant, and any deployed third-party Session Replay Provider, through Defendant's website are communications pursuant to 18 U.S.C. § 2510(12).   "Electronic communication" means *any communication* made in whole or in part through the use of facilities for the transmission of communications by the signs, signals, writing or data between the point of origin and the point of reception. *Id.*

89.     "Interception" means "the acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents… include any information concerning the substance, purport, or meaning of that communication."  18 U.S.C.§ 2510(4), (8). Both Carnival and the Session Replay Providers acquired the contents of Plaintiffs' and the Class Members' Website Communications.

90.     "Content" is broadly defined and when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication. 18 U.S.C.§ 2510(8).  Plaintiffs' and the Class Members' URLs, web page address information, mouse clicks and movements, scrolling, zooms (out or in), and text submissions (both partial and complete), including search terms or similar communications, were all collected by the Session Replay Code Defendant deployed on its website.  These are contents.

91.     "Intercepting device" or the "Electronic, mechanical or other device" means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication.  U.S.C.§ 2510(5).  Here, Plaintiffs' and the Class Members' browsers and computing devices and Defendant's webservers, website, and the Session Replay Code Defendant deployed are all "devices" for the purposes of the Wiretap Act.

92.     By deploying and embedding the Session Replay Code on Defendant's website, Defendant intentionally violated the Wiretap Act, through its interception,

attempt at interception, and its procurement of Session Replay Providers to intercept the content of Plaintiffs' and the Class Members' Website Communications.

93.     Defendant also willfully used or attempted to use the contents of Plaintiffs' and the Class members' electronic communications, knowing that the information was obtained through unlawful interception and in violation of 18 U.S.C. § 2511(1)(d).   Defendant's use of Plaintiffs' and the Class Members' data and information for advertising, revenue generating benefits, and other unknown purposes, in the absence of express written consent, is intentionally criminal and tortious where the conduct violates state law, including but not limited to an unlawful invasion of privacy.

94.     Without Plaintiffs' and Class members' knowledge or consent, Carnival intercepted and procured Session Replay Providers, including Microsoft Clarity, and more recently Content Square, to intercept the contents of their electronic communications when they navigated to the Carnival website.

95.     Carnival could have readily disclosed its use of Session Replay Code to Plaintiffs' and Class Members' and obtained their consent.   Instead, Carnival secretly deployed the code and deceived users.

96.     Carnival intentionally used technology—the Session Replay Code—as a means of intercepting and acquiring the contents of Plaintiffs' and Class members' electronic communications.  This violated the Wiretap Act in three primary ways.  First, Session Replay Code captured and disclosed partial or unintentional text submissions to Defendant's website. These included communications Plaintiffs and the Class members did not intend to send to Carnival or anyone.   Second, by deploying the Session Replay Code, Carnival also procured another, the Session Replay Providers, to intercept the contents of Plaintiffs' and the Class Members' Website Communications (both those intended for Carnival and not intended for Carnival) and disclosed those communications to unintended recipients to the communications (*i.e.*, the third-party Session Replay Providers).   Third, Carnival used the contents of

Plaintiffs' and the Class members' Website Communications after they were unlawfully intercepted, in violation of 18 U.S.C. § 2511(1), by third party Session Replay Providers for commercial gain. *See* 18 U.S.C. § 2511(1)(d).

97.    No party to the communication or consent exception applies to Defendant because Defendant's conduct falls outside the scope of these exceptions and the crime-tort exception to the exception applies.  *See* 18 U.S.C. § 2511(2)(d).  That Section states:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d).

98.    Criminal or tortious purposes include invading privacy, committing unfair business practices, committing or intent to commit trespass, or violating state computer crime laws. Defendant clearly had a criminal or tortious purpose for secretly installing and recording website users with the Session Replay Code. This Complaint asserts state law claims for invasion of privacy.  Additionally, each of the states the Plaintiffs are from have computer crime laws: California, Cal. Penal Code § 502, Maryland, Md. Stat. Crim. Law § 7-302, Massachusetts, Mass. Gen. Laws ch. 266 § 33A, ch. 266 § 120F, and Pennsylvania, 18 Pa. C.S.A. §§ 7601 *et seq.*

99.    Carnival's primary purpose for deploying Session Replay Code was to secretly, and without permission, collect data from users.  The data the Session Replay Code collected from users was all encompassing, including information that users never intended to send to website owners and certainly did not intend to send to third party Session Replay Providers.  This satisfies an intent to invade users' privacy and also an intent to violate state computer crime laws, which generally prohibit unauthorized access to computer data, systems, and networks.

100.   Carnival's interception of Plaintiffs' and the Class Members' data, and procurement of Session Replay Providers who also intercepted Plaintiffs' and the Class Members' data violated the Wiretap Act. Carnival's subsequent use of data, in a manner for which it lacked permission, namely associating the data with users' pre-existing online activity and using it to advertise, including for direct targeted advertisements based on Plaintiffs and Class Members, violated Section 2511(1)(d), a distinct violation of the Wiretap Act, and it and of itself satisfies Section 2511(2)(d)'s unlawful purpose exception.

101.   Pursuant to 18 U.S.C. § 2511(5)(b), for violations of the Wiretap Act, the Court "may use any means within its authority to enforce an injunction issued under paragraph (ii)(A) and shall impose a civil fine of not less than $500 for each violation of the injunction. Additionally, 18 U.S.C. § 2520 provides that any person whose wire, oral or electronic communication is intercepted, disclosed or intentionally used in violation of Chapter 119, may recover from the person or entity that engaged in the violation in a civil action.

102.   Plaintiffs and Class members are persons whose electronic communications were intercepted within the meaning of Section 2520. As such, they are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual damages, punitive damages, and reasonable attorneys' fees and costs of suit.

## COUNT II
## VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 630 *et. seq.*
### (on behalf of California Class)

103.   Plaintiffs Price and Mikulsky incorporate the above allegations by reference as if fully set forth herein and bring this count individually and on behalf of the California Class. For the purposes of Count II, "Plaintiffs" refer to Plaintiffs Price and Mikulsky, and "Class" refers to the California Class.

104. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630-638. The Act contains the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

105. California Penal Code § 631(a) accordingly provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

106. At all relevant times, Carnival's business practice of injecting Session Replay Code allowed it to access, intercept, learn the contents of and collect Plaintiffs' and Class members' personally identifiable information and other data.

107. Plaintiffs, and each Class member, visited and/or interacted with the Carnival website while in California.

108. Plaintiffs and Class members did not consent to any of Carnival's actions in intercepting, reading, and learning the contents of their communications or disclosing those communications to an unknown third-party.

109. Carnival's conduct was intentional in that it purposefully installed code which allows it to eavesdrop and learn the content of its users' communications and other browsing activities that would otherwise be unavailable to Carnival without engaging in this practice. Carnival directly participated in the interception, reading, and/or learning of the contents of the communications between Plaintiffs, Class members and California-based web entities.

110.   The information Carnival intercepted and procured third-party Session Replay Providers to intercept while Plaintiffs and Class members were using its website includes personally identifiable information and other highly specific information and communications, including, without limitation, every button, keystroke and link a user taps, whether the user has taken any screenshots, text entries (including passwords and credit card information), and how much time a user spent on the website.

111.   Additionally, Carnival wrongfully, negligently and/or intentionally, aided, abetted, conspired with and/or employed the Session Replay Providers, including but not limited to Microsoft and/or ContentSquare, to unlawfully and without the consent of all parties record, read and/or otherwise gain access to the electronic communication(s) of the Plaintiffs and Class members and/or otherwise violate California law, including California Penal Code § 631(a).

112.   The information Carnival intercepts, or aids the Session Replay Provider in intercepting, while Plaintiffs and Class Members are using Carnival's website includes personally identifiable information and other highly specific information and communications, including, without limitation, every button, keystroke and link a user taps, whether the user has taken any screenshots, text entries (including passwords and credit card information), and how much time a user spent on the website.

113.   Plaintiffs and Class members have suffered loss by reason of these violations, including but not limited to, violation of the right to privacy. Unless restrained and enjoined, Carnival will continue to commit such acts.

114.   As a result of the above violations and pursuant to CIPA section 637.2, Carnival is liable to Plaintiffs and Class members for the greater of treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 provides "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

115.   Plaintiffs further request, as provided under CIPA, reasonable attorneys' fees and costs of suit, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury sufficient to prevent or deter the same or similar conduct by Carnival.

**COUNT III**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**(on behalf of California Class)**

116.   Plaintiffs Price and Mikulsky incorporate the above allegations by reference as if fully set forth herein and bring this count individually and on behalf of the California Class. For the purposes of Count III, "Plaintiffs" refer to Plaintiffs Price and Mikulsky, and "Class" refers to the California Class.

117.   California law recognizes the tort of invasion of privacy/intrusion on seclusion.

118.   Plaintiffs and Class members have an objective, reasonable expectation of privacy in their Website Communications.  In violation of this expectation, Carnival installed Session Replay Code on its website and that code was present on Plaintiffs' and the Class members' web browsers, recording their every move.

119.   Plaintiffs and Class members did not consent to, authorize, or know about Carnival's intrusion at the time it occurred. Plaintiffs and Class members never agreed that Carnival could collect or disclose their Website Communications.

120.   Plaintiffs and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

121.   Carnival intentionally intrudes on Plaintiffs' and Class members' private life, seclusion, or solitude, without consent, by, for all intents and purposes, installing a recording device on their web browsers.

122.   Carnival's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

123.   Plaintiffs and Class members were harmed by Carnival's wrongful conduct as Carnival's conduct has caused Plaintiffs and Class members mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.  Indeed, Carnival's conduct has needlessly harmed Plaintiffs and Class members by capturing intimately personal facts and data in the form of their Website Communications. This intrusion and disclosure of information and loss of privacy and confidentiality has caused Plaintiffs and Class members to experience mental anguish, emotional distress, worry, fear, and other harms.

124.   Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiffs' and Class members' property.

125.   Further, Carnival has improperly profited from its invasion of Plaintiffs' and Class members' privacy in its use of their data for its economic value and Carnival's own commercial gain.

126.   As a direct and proximate result of Carnival's conduct, Plaintiffs and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

127.   Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiffs and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiffs and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## **COUNT IV**

### **VIOLATION OF MARYLAND WIRETAP ACT**
**Md. Code Ann., Cts. & Jud. Proc. § 10-401,** *et seq.*
**(on behalf of Maryland Class)**

128.   Plaintiff Hernandez incorporates paragraphs 1 through 82 as if fully set forth herein and brings this count individually and on behalf of the Maryland Class. For the purposes of Count IV, "Plaintiff" refers to Plaintiff Hernandez, and "Class" refers to the Maryland Class.

129.   The Maryland Wiretap Act (the "Act") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the willful disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the willful use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. Md. Code Ann., Cts. & Jud. Proc. § 10-402.

130.   Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. Md. Code Ann., Cts. & Jud. Proc. § 10-410(a).

131.   "Intercept" is defined as any "aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device." Md. Code Ann., Cts. & Jud. Proc. § 10-401(10).

132.   "Contents" is defined as when "used with respect to any wire, oral, or electronic communication, includes any information concerning the identity of the

parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code Ann., Cts. & Jud. Proc. § 10-401(4).

133. "Person" is defined as, in relevant part "any individual, partnership, association, joint stock company, trust, or corporation." Md. Code Ann., Cts. & Jud. Proc. § 10-401(5)(i).

134. "Electronic Communication" is defined as "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md. Code Ann., Cts. & Jud. Proc. § 10-401(5)(i).

135. Carnival is a person for purposes of the Act because it is a corporation.

136. Session Replay Code like that procured by Carnival is a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of the Act.

137. Plaintiff's and Class members' intercepted Website Communications constitute the "contents" of electronic "communications" within the meaning of the Act.

138. Carnival willfully procures and embeds Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' electronic interactions communications with Carnival in real time.

139. Plaintiff's and Class members' electronic communications are intercepted contemporaneously with their transmission.

140. Plaintiff and Class members did not consent to having their Website Communications wiretapped.

141. Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 10-410, Plaintiff and Class members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

142.   Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT V
## INVASION OF PRIVACY – INTRUSION UPON SECLUSION
### (on behalf of the Maryland Class)

143.   Plaintiff Hernandez incorporates paragraphs 1 through 82 and paragraphs 128 through 142 as if fully set forth herein and brings this count individually and on behalf of the Maryland Class. For the purposes of Count V, "Plaintiff" refers to Plaintiff Hernandez, and "Class" refers to the Maryland Class.

144.   Maryland common law recognizes the tort of invasion of privacy.

145.   Plaintiff and Class members have an objective, reasonable expectation of privacy in their Website Communications.

146.   Plaintiff and Class members did not consent to, authorize, or know about Carnival's intrusion at the time it occurred. Plaintiff and Class members never agreed that Carnival could collect or disclose their Website Communications.

147.   Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

148.   Carnival willfully intrudes on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

149.   Carnival's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

150.   Plaintiff and Class members were harmed by Carnival's wrongful conduct as Carnival's conduct has caused Plaintiff and the Class mental anguish and suffering

arising from their loss of privacy and confidentiality of their electronic communications.

151.   Carnival's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and Class members to experience mental anguish, emotional distress, worry, fear, and other harms.

152.   Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

153.   Further, Carnival has improperly profited from its invasion of Plaintiff's and Class members' privacy in its use of their data for its economic value.

154.   As a direct and proximate result of Carnival's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

155.   Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT VI**
**VIOLATION OF MASSACHUSETTS WIRETAP ACT**
**Mass. Gen. Laws ch. 272, §99**
**(on behalf of Massachusetts Class)**

156.   Plaintiff Rubridge incorporates paragraphs 1 through 82 as if fully set forth herein and brings this count individually and on behalf of the Massachusetts Class. For the purposes of Counts VI, "Plaintiff" refers to Plaintiff Rubridge and "Class" refers to the Massachusetts Class.

157. The Massachusetts Wiretap Statute (the "Statute") prohibits the interception, attempted interception, use, or disclosure of any oral or wire communications which violates personal, property, or privacy interests. Mass. Gen. Laws ch. 272, §99(C).

158. The express legislative purpose of Mass. Gen. Laws ch. 272, §99's unequivocal ban on secret recordings is to protect Massachusetts citizens' privacy. In fact, the Statute's preamble states that secret recording "pose[s] grave dangers to the privacy of all citizens of the commonwealth." Mass. Gen. Laws ch. 272, §99(A).

159. Any aggrieved person whose oral or wire communications were intercepted, disclosed, or used except as permitted or authorized by the Statute or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by the Statute shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest, and shall be entitled to recover from any such person actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher; punitive damages; and a reasonable attorney's fee and other litigation disbursements reasonably incurred. Mass. Gen. Laws ch. 272, §99(Q).

160. "Interception" means to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Mass. Gen. Laws ch. 272, §99(B)(4).

161. "Contents" when "used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." Mass. Gen. Laws ch. 272, §99(B)(5).

162. "Intercepting device" means "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other

than a hearing aid or similar device which is being used to correct subnormal hearing to normal and other than any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user In the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business."  Mass. Gen. Laws ch. 272, §99(B)(3).

163.   "Wire communication" means "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception."  Mass. Gen. Laws ch. 272, §99(B)(1).

164.   "Person" means "any individual, partnership, association, joint stock company, trust, or corporation, whether or not any of the foregoing is an officer, agent or employee of the United States, a state, or a political subdivision of a state."  Mass. Gen. Laws ch. 272, §99(B)(13).

165.   "Use" includes "willfully us[ing] or attempt[ing] to use the contents of any wire or oral communication, knowing that the information was obtained through interception."  Mass. Gen. Laws ch. 272, §99(C)(3)(b).

166.   Carnival is a person for purposes of the Statute because it is a corporation.

167.   Session Replay Code like that procured by Carnival is an "intercepting device," within the meaning of the Statute.  Mass. Gen. Laws ch. 272, §99(B)(3).

168.   Plaintiff's and Class members' intercepted Website Communications constitute the "contents" of "electronic communication[s]" within the meaning of the Statute.

169.   Carnival intentionally procures and embeds Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' electronic interactions communications with Carnival in real time.

170.   Plaintiff's and Class members' electronic communications are intercepted contemporaneously with their transmission.

171.   Plaintiff and Class members did not consent to having their Website Communications wiretapped.

172.   Carnival's conduct violated Mass. Gen. Laws ch. 272, §99 and therefore gives rise to a claim under Mass. Gen. Laws ch. 272, §99(Q).

173.   Pursuant to Mass. Gen. Laws ch. 272, §99(Q), Plaintiff and Class members seek (1) actual damages, not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

174.   Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent.  Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

<u>**COUNT VII**</u>
**INVASION OF PRIVACY**
**Mass. Gen. Laws ch. 272, §99**
**(on behalf of Massachusetts Class)**

175.   Plaintiff Rubridge incorporates paragraphs 1 through 82 and paragraphs 156 through 174 as if fully set forth herein and brings this count individually and on behalf of the Massachusetts Class. For the purposes of Count VII, "Plaintiff" refers to Plaintiff Rubridge, and "Class" refers to the Massachusetts Class.

176.   Massachusetts common law recognizes the tort of invasion of privacy. The right to privacy is also embodied by statute.

177.   Pursuant to Mass. Gen. Laws ch. 214, §1B, "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy.  The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

178.   Plaintiff and Class members have an objective, reasonable expectation of privacy in their Website Communications.

179.   Plaintiff and Class members did not consent to, authorize, or know about Carnival's intrusion at the time it occurred or the disclosure of information to third-party Session Replay Providers.   Plaintiff and Class members never agreed that Carnival could collect or disclose their Website Communications.

180.   Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

181.   Carnival intentionally intrudes on Plaintiff's and Class members' private life, seclusion, or solitude, without consent, by, for all intents and purposes, installing a recording device on their web browsers.

182.   Carnival's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

183.   Plaintiff and Class members were harmed by Carnival's wrongful conduct as Carnival's conduct has caused Plaintiff and Class members mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

184.   Carnival's conduct has needlessly harmed Plaintiff and Class members by capturing intimately personal facts and data in the form of their Website Communications.   This disclosure and loss of privacy and confidentiality has caused Plaintiff and Class members to experience mental anguish, emotional distress, worry, fear, and other harms.

## COUNT VIII
### VIOLATION OF PENNSYLVANIA WIRETAP ACT
### 18 Pa. Cons. Stat. § 5701 *et. seq.*
### (on behalf of Pennsylvania Class)

185.   Plaintiff Oliver incorporates paragraphs 1 through 82 as if fully set forth herein and brings this count individually and on behalf of the Pennsylvania Class. For the purposes of Count VIII, "Plaintiff" refers to Plaintiff Oliver, and "Class" refers to the Pennsylvania Class.

186.   The Pennsylvania Wiretap Act (the "Act") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

187.   Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

188.   "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

189.   "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

190.   "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

191.   "Electronic Communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

192.   Carnival is a person for purposes of the Act because it is a corporation.

193.   Session Replay Code like that procured by Carnival is a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of the Act.

194.   Plaintiff's and Class members' intercepted Website Communications constitute the "contents" of electronic communication[s]" within the meaning of the Act.

195.   Carnival intentionally procures and embeds Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' electronic interactions communications with Carnival in real time.

196.   Plaintiff's and Class members' electronic communications are intercepted contemporaneously with their transmission.

197.   Plaintiff and Class members did not consent to having their Website Communications wiretapped.

198.   Pursuant to 18 Pa. Cons. Stat. 5725(a), Plaintiff and Class members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

199.   Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class

members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT IX
## INVASION OF PRIVACY – INTRUSION UPON SECLUSION
### (on behalf of Pennsylvania Class)

200.   Plaintiff Oliver incorporates paragraphs 1 through 82 and paragraphs 185 through 199 as if fully set forth herein and brings this count individually and on behalf of the Pennsylvania Class. For the purposes of Count IX, "Plaintiff" refers to Plaintiff Oliver, and "Class" refers to the Pennsylvania Class.

201.   Pennsylvania common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in multiple sections of the Pennsylvania constitution.

202.   Plaintiff and Class members have an objective, reasonable expectation of privacy in their Website Communications.

203.   Plaintiff and Class members did not consent to, authorize, or know about Carnival's intrusion at the time it occurred. Plaintiff and Class members never agreed that Carnival could collect or disclose their Website Communications.

204.   Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

205.   Carnival intentionally intrudes on Plaintiff's and Class members' private life, seclusion, or solitude, without consent, by, for all intents and purposes, installing a recording device on their web browsers.

206.   Carnival's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

207.   Plaintiff and Class members were harmed by Carnival's wrongful conduct as Carnival's conduct has caused Plaintiff and the Class mental anguish and suffering

arising from their loss of privacy and confidentiality of their electronic communications.

208. Carnival's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

209. Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

210. Further, Carnival has improperly profited from its invasion of Plaintiff and Class members' privacy in its use of their data for its economic value.

211. As a direct and proximate result of Carnival's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

212. Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## **REQUEST FOR RELIEF**

Plaintiffs, individually and on behalf of members of the proposed Classes, respectfully request that the Court enter judgment in Plaintiffs' and the Classes' favor and against Defendant as follows:

A. Certifying the Nationwide Class and appointing Plaintiffs as the Nationwide Class representatives;

1      B.      Certifying the California Class and appointing Plaintiffs India Price and
2  Erica Mikulsky as the California Class representatives;

3      C.      Certifying the Maryland Class and appointing Marilyn Hernandez as the
4  Maryland Class representative;

5      D.      Certifying the Massachusetts Class and appointing Daniel Rubridge as the
6  Massachusetts Class representative;

7      E.      Certifying the Pennsylvania Class and appointing Ariel Oliver as the
8  Pennsylvania Class representative;

9      F.      Appointing Plaintiffs' Counsel as class counsel for the Nationwide,
10  California, Maryland, Massachusetts, and Pennsylvania Classes;

11      G.      Declaring that Defendant's past conduct was unlawful, as alleged herein;

12      H.      Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

13      I.      Enjoining Defendant from continuing the unlawful practices described
14  herein, and awarding such injunctive and other equitable relief as the Court deems just
15  and proper;

16      J.      Awarding Plaintiffs and the members of the Classes statutory, actual,
17  compensatory, consequential, punitive, and nominal damages, as well as restitution
18  and/or disgorgement of profits unlawfully obtained;

19      K.      Awarding Plaintiffs and the members of the Classes pre-judgment and
20  post-judgment interest;

21      L.      Awarding Plaintiffs and the members of the Classes reasonable attorneys'
22  fees, costs, and expenses; and

23      M.      Granting such other relief as the Court deems just and proper.

24            **<u>DEMAND FOR JURY TRIAL</u>**

25      Plaintiffs, on behalf of themselves and the Classes, demand a trial by jury of any
26  and all issues in this action so triable of right.

27

28

Dated: August 7, 2023                    Respectfully submitted,

                                         **LYNCH CARPENTER, LLP**

                                         */s/ Todd D. Carpenter*
                                         Todd D. Carpenter (SBN 234464)
                                         todd@lcllp.com
                                         1234 Camino del Mar
                                         Del Mar, CA 92014
                                         Tel: 619-762-1910
                                         Fax: 619-756-6991

                                         **LYNCH CARPENTER, LLP**
                                         Gary F. Lynch
                                         Kelly K. Iverson
                                         Jamisen A. Etzel
                                         Elizabeth Pollock-Avery
                                         Nicholas A. Colella
                                         Patrick D. Donathen
                                         1133 Penn Avenue, 5th Floor
                                         Pittsburgh, Pennsylvania 15222
                                         Telephone: 412-322-9243
                                         Facsimile: 412-231-0246
                                         gary@lcllp.com
                                         kelly@lcllp.com
                                         jamisen@lcllp.com
                                         elizabeth@lcllp.com
                                         nickc@lcllp.com
                                         patrick@lcllp.com

                                         **LYNCH CARPENTER, LLP**
                                         Katrina Carroll
                                         111 W. Washington St., Suite 1240
                                         Chicago IL 60602
                                         Tel.: (312) 750-1265
                                         katrina@lcllp.com

                                         Jonathan M. Jagher
                                         **FREED KANNER LONDON
                                         & MILLEN LLC**
                                         923 Fayette Street Conshohocken,
                                         Pennsylvania 19428
                                         Tel.: (610) 234-6486

- 42 -

1    jjagher@fklmlaw.com

2    Steven M. Nathan, SBN 153250
3    **HAUSFELD LLP**
     33 Whitehall Street
4    Fourteenth Floor
5    New York, NY 10004
     Telephone: (646) 357-1100
6    Email: snathan@hausfeld.com

7
     James J. Pizzirusso
8    **HAUSFELD LLP**
9    888 16th Street N.W.
     Suite 300
10   Washington, D.C. 20006
11   Telephone: (202) 540-7200
     Email: jpizzirusso@hausfeld.com
12

13   Stephen B. Murray
14   Stephen B. Murray, Jr.
     Arthur M. Murray
15   Thomas M. Beh
     **THE MURRAY LAW FIRM**
16   701 Poydras Street, Suite 4250
17   New Orleans, Louisiana 70139
     Telephone: (504) 525-8100
18   Email: Tbeh@Murray-lawfirm.com

19
     Joseph P. Guglielmo
20   Carey Alexander
21   Ethan S. Binder
     **SCOTT+SCOTT ATTORNEYS AT**
22   **LAW LLP**
23   The Helmsley Building
     230 Park Avenue, 17th Fl.
24   New York, NY 10169
25   Tel.: (212) 223-6444
     jguglielmo@scott-scott.com
26   calexander@scott-scott.com
27   ebinder@scott-scott.com

28

- 43 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brian C. Gudmundson
Michael J. Laird
Rachel K. Tack
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel.: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.con
rachel.tack@zimmreed.com

*Counsel for Plaintiffs*

CONSOLIDATED CLASS ACTION COMPLAINT