JACOB HEATH (STATE BAR NO. 238959)
jheath@orrick.com
ARAVIND SWAMINATHAN (*pro hac vice
forthcoming*)
aswaminathan@orrick.com
REBECCA HARLOW (STATE BAR NO. 281931)
rharlow@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:  +1 415 773 5700
Facsimile:  +1 415 773 5759

Attorneys for Defendant
CARNIVAL CORPORATION

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDIA PRICE, ERICA MIKULSKY, MARILYN HERNANDEZ, DANIEL RUBRIDGE, and ARIEL OLIVER, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CARNIVAL CORPORATION,<br><br>Defendant. | Case No. 3:23-CV-00236<br><br>**DEFENDANT CARNIVAL CORPORATION'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Judge:  Hon. Gonzalo P. Curiel |

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3      PLEASE TAKE NOTICE that on November 3, 2023 at 1:30 p.m., or as soon

4   thereafter as available, in the courtroom of the Honorable Gonzalo P. Curiel,

5   located at Edward J. Schwartz United States Courthouse, 221 West Broadway,

6   Courtroom 2D, 2d Floor, San Diego, California 92101, Defendant Carnival

7   Corporation ("Carnival"), will and hereby does move to dismiss the Consolidated

8   Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  This

9   Motion is based on this Notice of Motion and Motion, the Memorandum of Points

10   and Authorities, the pleadings and papers on file in this action, any other such

11   matters of which the Court may take judicial notice, and any other matter that the

12   Court may properly consider.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS
3:23-CV-00236

1

**TABLE OF CONTENTS**

2

Page

3    NOTICE OF MOTION AND MOTION TO DISMISS ............................................... i

4    TABLE OF AUTHORITIES ...................................................................................... iii

5    I.    INTRODUCTION ............................................................................................ 1

6    II.    SUMMARY OF RELEVANT FACTS ........................................................... 3

7          A.    Carnival Uses Microsoft's Clarity Tool to Improve Visitors'
                Experiences On Its Website. ................................................................. 3

8          B.    The Clarity Tool Can Track Mouse Clicks, Mouse Gestures, And
                Keystrokes To Improve Website Visitors' Experiences. ...................... 3

9
          C.    Carnival's Privacy Notice Tells Visitors When and How Carnival
10              Collects Information. ............................................................................ 4

11         D.    Plaintiffs Use Carnival's Website To Provide Carnival With
                Information, Then Sue Carnival For Keeping Track Of That Same
12              Information. .......................................................................................... 7

13   III.    LEGAL STANDARD .................................................................................... 8

14   IV.    LEGAL ARGUMENT ................................................................................... 8

15         A.    Plaintiffs Fails To State A Wiretapping Claim (Counts I, II, IV, VI
                & VII). .................................................................................................. 8

16              1.    Plaintiffs fail to plead facts showing that Carnival acted
                      without consent ......................................................................... 9
17
                2.    Plaintiffs fail to plead facts showing that Carnival
18                    "intercepted" a communication. ............................................. 13

19              3.    Plaintiffs fail to plead facts showing that Carnival accessed
                      the "contents" of any message. .............................................. 15
20
                4.    Plaintiffs fail to plead facts showing that Carnival used a
21                    "device" to accomplish the supposed interception ................. 18

22              5.    Plaintiffs' Federal Wiretap Act claim separately fails because
                      Carnival is a party to the communications. ........................... 21
23
          B.    Plaintiffs Fail to State an Invasion of Privacy Claim (Counts III, V,
24              VII & IX). ........................................................................................... 23

     V.    CONCLUSION ............................................................................................ 25
25

26

27

28

MOTION TO DISMISS
3:23-CV-00236

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.S. v. Pennsylvania State Police,*
  636 Pa. 403 (2016)............................................................21

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...........................................8, 12, 19, 23

*Bourgeois v. Live Nation Ent., Inc.,*
  430 Md. 14 (2013)............................................................21

*Branyan v. Sw. Airlines Co.,*
  105 F. Supp. 3d 120 (D. Mass. 2015)................................23, 24

*Briddell v. State,*
  2016 WL 4698158 (Md. Ct. Spec. App. 2016) ..............9, 10

*In re Carrier IQ, Inc.,*
  78 F.Supp.3d 1051 (N.D. Cal. 2015)................................18

*Chicarella v. Passant,*
  494 A.2d 1109 (Pa. Super. 1985) ....................................24

*Com. v. Blystone,*
  519 Pa. 450 (1988)............................................................8

*Com. v. Vitello,*
  367 Mass. 224 (1975).........................................................8

*Commonwealth v. Byrd,*
  235 A.3d 311 (Pa. 2020).................................9, 10, 11

*Commonwealth v. Cruttenden,*
  58 A.3d 95 (Pa. 2012).................................................10, 11

*Commonwealth v. Mock,*
  656 Pa. 174 (2019)............................................................20

*Consolidation Coal Co. v. Fed. Mine Safety & Health Review
  Comm'n,*
  136 F.3d 819 (D.C. Cir. 1998) .......................................19

MOTION TO DISMISS
3:23-CV-00236

*Cook v. Gamestop, Inc.*,
  2023 WL 5529772 (W.D. Pa. Aug. 28, 2023) ............................................. 2, 17

*Curtatone v. Barstool Sports, Inc.*,
  487 Mass. 655 (2021) ................................................................................. 10

*Davis v. State*,
  43 A.3d 1044 (Md. 2012) ............................................................................ 8

*Demo v. Kirksey*,
  2018 WL 5994995 (D. Md. 2018) .............................................................. 23

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ...................................................................... 21

*In re Finjan Holdings, Inc.*,
  58 F.4th 1048 (9th Cir. 2023) ..................................................................... 12

*Freeman v. Gonzales*,
  444 F.3d 1031 (9th Cir. 2006) .................................................................... 19

*Gonzales v. Uber Techs., Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018) ................................................. 17, 18

*Gonzalez v. Planned Parenthood of L.A.*,
  759 F.3d 1112 (9th Cir. 2014) ...................................................................... 8

*In re Google Assistant Priv. Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................... 23, 24

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. 2014) ........................................................... 22

*In re Google, Inc. Privacy Policy Litig.*,
  58 F. Supp. 3d 968 (N.D. Cal. 2014) ......................................................... 24

*Greco v. State*,
  347 Md. 423 (1997) ................................................................................... 20

*In re iPhone Application Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................................................... 16

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) ............................................................ 4

*Konop v. Hawaiian Airlines, Inc.,*
    302 F.3d 868 (9th Cir. 2002) ............................................................ 13

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004) ............................................................................ 21

*Licea v. Am. Eagle Outfitters, Inc.,*
    2023 WL 2469630 (C.D. Cal. 2023) ................................................ 14

*Licea v. Cinmar, LLC,*
    2023 WL 2415592 (C.D. Cal. 2023) ................................................ 14

*Low v. LinkedIn Corp.,*
    900 F. Supp. 2d 1010 (N.D. Cal. 2012) ............................................ 24

*Martin v. Sephora USA, Inc.,*
    2023 WL 2717636 (E.D. Cal. 2023) ................................................ 14

*McNemar v. The Disney Store, Inc.,*
    91 F.3d 610 (3d. Cir. 1996) .............................................................. 24

*In re Meta Pixel Healthcare Litig.,*
    2022 WL 17869218 (N.D. Cal. 2022) ............................................ 9, 22

*Noe v. Sex Offender Registry Bd.,*
    2017 WL 1275358 (Mass. Super. 2017) ............................................ 21

*NovelPoster v. Javitch Canfield Group,*
    140 F. Supp. 3d 938 (N.D. Cal. 2014) .............................................. 14

*Osprey Portfolio, LLC v. Izett,*
    620 Pa. 274 (2013) .......................................................................... 19

*Pena v. GameStop, Inc.,*
    2023 WL 3170047 (S.D. Cal. 2023) ................................................ 8, 13

*People v. Nakai,*
    183 Cal. App. 4th 499 (2010) ............................................................ 10

- v -

CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

*Perkins v. LinkedIn Corp.,*
    53 F. Supp. 3d 1190 (N.D. Cal. 2014) ................................................ 10

*Popa v. Harriet Carter Gifts, Inc.,*
    426 F. Supp. 3d 108 (W.D. Pa. 2019) ......................................... 23, 24

*Poulsen v. Dept. of Def.,*
    994 F.3d 1046 (9th Cir. 2021) ........................................................... 20

*Rosenow v. Facebook, Inc.,*
    2020 WL 1984062 (S.D. Cal. 2020) ................................................. 13

*Schreyer v. Chaplain,*
    416 Md. 94 (2010) ............................................................................. 19

*Silver v. Stripe Inc.,*
    2021 WL 3191752 (N.D. Cal. 2021) ................................................. 10

*Sprewell v. Golden State Warriors,*
    266 F.3d 979 (9th Cir. 2001) ............................................................ 15

*Squeri v. Mount Ida Coll.,*
    2019 WL 2249722 (D. Mass. 2019) .................................................. 24

*In re Stevens,*
    15 F.4th 1214 (9th Cir. 2021) ........................................................... 19

*Svenson v. Google Inc.,*
    65 F. Supp. 3d 717 (N.D. Cal. 2014) ................................................ 18

*Town of Boylston v. Comm'r of Revenue,*
    434 Mass. 398 (2001) ........................................................................ 19

*U.S. v. Staves,*
    383 F.3d 977 (9th Cir. 2004) ............................................................ 10

*Underhill v. Kornblum,*
    2017 WL 2869734 (S.D. Cal. 2017) ............................................ 13, 15

*United States v. Steiger,*
    318 F.3d 1039 (11th Cir. 2003) ........................................................ 14

CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

*In re Vizio, Inc. Consumer Privacy Litig.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017)..........................................13, 15

*Wheatley v. Massachusetts Insurers Insolvency Fund*,
    456 Mass. 594 (2010) ................................................................20

*In re Zynga Privacy Litig.*,
    750 F. 3d 1098 (9th Cir. 2014) ...................................................16

**Statutes**

18 U.S.C. § 2016.........................................................................8

18 U.S.C. § 2510...............................................1, 8, 16, 18, 19, 20

18 U.S.C. § 2511.....................................8, 9, 13, 21, 22, 23

18 U.S.C. § 2512.......................................................................20

Cal. Penal Code § 630 ...............................................................1

Cal. Penal Code § 631 ..........................................8, 9, 10, 13, 16

Mass. Gen. Laws Ann. ch. 272, § 99................1, 9, 13, 16, 18, 20

Md. Code Ann., Cts. & Jud. Proc. § 10-401...............16, 18, 20

Md. Code Ann., Cts. & Jud. Proc. § 10-402..................1, 9, 13

Md. Code Ann., Cts. & Jud. Proc. § 10-403........................20

18 Pa. Stat. § 5701 ....................................................................1

18 Pa. Stat. § 5702 ....................................................16, 18, 20

18 Pa. Stat. § 5703 ..................................................................13

18 Pa. Stat. § 5704 ....................................................................9

18 Pa. Stat. § 5705 ..................................................................20

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................8

CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

**Other Authorities**

https://www.carnival.com/about-carnival/legal-notice/privacy-notice .............4, 5, 6

Webster's Third New International Dictionary of the English
    Language Unabridged 618 (2002)....................................................................19

CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

1   **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.      INTRODUCTION**

3   Carnival, the world's largest leisure travel company, maintains a website at

4   carnival.com, which allows visitors to learn about Carnival's offerings, plan

5   vacations, and book cruises.  To help improve website visitors' experiences, Carnival

6   is alleged to use a Microsoft software tool called Clarity, which allows Carnival to

7   track its own users' interactions with carnival.com, including mouse movements, text

8   entry, and scrolling.  Consolidated Class Action Complaint, ECF No. 15 ("CAC")

9   ¶¶ 50-52.  This information can help reveal to Carnival if there are certain pages, or

10  parts of pages, on its website that are causing users confusion or frustration.  In fact,

11  this is exactly why Clarity and tools like it are employed not just (as the CAC alleges)

12  on carnival.com, but on a broad array of websites across the Internet.

13  Between December 2022 and February 2023, Plaintiffs filed several different

14  actions against Carnival, all of which have now been transferred to this District and

15  consolidated in this action, alleging that Carnival's use of Clarity constituted

16  unlawful recording of their interactions with carnival.com without their consent.  *See*

17  CAC ¶ 63.  Specifically, Plaintiffs allege that at some unspecified time in the past,

18  they visited carnival.com and "us[ed] their mouse to hover and click on certain links

19  and items."  CAC ¶ 67.  Carnival, Plaintiffs claim, captured those mouse movements

20  (as well as information about their device and browser types) with Clarity, and in so

21  doing violated a federal criminal statute and various state analogues, enacted in the

22  1960s and 1970s to prohibit wiretapping of telephone and telegraph lines.  *See*

23  Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; California Invasion of Privacy Act

24  ("CIPA"), Cal. Penal Code § 630, *et seq.*; Wiretapping and Electronic Surveillance

25  Control Act ("WESCA"), 18 Pa. Stat. §§ 5701, *et seq.*; Md. Code Ann., Cts. & Jud.

26  Proc. § 10-402; Mass. Gen. Laws Ann. ch. 272, § 99; CAC ¶ 63.  Plaintiffs also allege

27  that when Carnival used Clarity to record their interactions with its website, it

28  violated those same states' statutory and common-law prohibitions on invading

1    another's privacy.  CAC ¶ 63.  On these bases, Plaintiffs seek statutory damages of

2    at least $1,000 for every individual who ever visited carnival.com.

3        Unsurprisingly, the law—for many reasons—does not support Plaintiffs'

4    assertion that every user of carnival.com is the victim of a crime.  The wiretapping

5    laws apply only where a defendant (1) without consent (2) intentionally "intercepts"

6    (3) the substantive "contents" of a communication (4) using a "device."  Here, facts

7    alleged in the Complaint do not establish any of those elements, much less all: *First*,

8    Plaintiffs consented to Carnival learning of their interactions with its website when

9    they deliberately navigated to that site and used it to voluntarily provide Carnival

10   with information—after being informed (immediately upon landing on the page) that

11   their interactions were subject to tracking.  *Second*, Plaintiffs fail to plead facts

12   showing that Carnival "intercepted" their interactions with its website—that is,

13   diverted the information while it was in transit from Plaintiffs' computers or

14   smartphones to carnival.com, as opposed to learning of it from Plaintiffs' devices,

15   *before* it could have left and/or been in transit.  *Third*, the limited interactions that

16   Plaintiffs engaged in on carnival.com do not constitute the kinds of substantive

17   communication "contents" that the wiretapping laws were enacted to protect.  *Fourth*,

18   the snippets of Clarity software code that Carnival embedded in its website do not

19   constitute a physical wiretapping "device" of the type that the wiretapping laws

20   meant to outlaw when they were enacted in the 1960s and 1970s.  Accordingly, an

21   "increasing number of courts" have rejected lawsuits claiming that software like

22   Clarity violates the wiretapping laws.  *Cook v. Gamestop, Inc.*, 2023 WL 5529772,

23   at *1 (W.D. Pa. Aug. 28, 2023).  Additionally, the caselaw has already considered—

24   and rejected—Plaintiffs' suggestion that the use of technology like Clarity constitutes

25   a "highly offensive" privacy invasion, as required to be actionable under the laws of

26   all the states at issue here.

27

28

- 2 -

Every one of Plaintiffs' claims thus fails as a matter of law.  The Consolidated Class Action Complaint should be dismissed in its entirety.

## II.    SUMMARY OF RELEVANT FACTS

### A.    Carnival Uses Microsoft's Clarity Tool to Improve Visitors' Experiences On Its Website.

Launched in 1972, Carnival is now the world's largest leisure travel company, operating Carnival Cruise Line—"The World's Most Popular Cruise Line®"—and offering voyages from every coast in the United States.  Carnival's website, carnival.com, allows its visitors to search for cruises, plan and book travel, search for travel agents, and learn information about Carnival.

Carnival continually seeks to improve visitors' experiences by identifying glitches or areas on its website that may interfere with the user experience.  To do so, Carnival sometimes requires information about visitors' interactions with its website (e.g., where users are getting lost, confused, or stuck).  To that end, Plaintiffs allege that Carnival contracted with Microsoft to receive access to a software tool known as "Clarity."  *See* CAC ¶ 50.  Specifically, Clarity comprises "snippets of JavaScript computer code," which Plaintiffs claim Carnival embedded into carnival.com.  *See* CAC ¶¶ 1, 60.

### B.    The Clarity Tool Can Track Mouse Clicks, Mouse Gestures, And Keystrokes To Improve Website Visitors' Experiences.

The Clarity tool that Carnival allegedly purchased from Microsoft, sometimes called "Session Replay Code" in the Complaint, allows a website owner to track mouse clicks, mouse movement, scrolls, forms, and other interactions on its website.  *See* CAC ¶ 52.  The tool is customizable, allowing its users to "mask[] sensitive information collected from a user's interactions with a website" so that it will not be recorded.  CAC ¶ 55.  One of Clarity's "standard" settings, for instance, allows the website owner to mask "all text entered by a user." *Id.*  Additionally, Clarity enables

- 3 -

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

1   websites to "customize the standard masking approaches" by "select[ing] specific

2   elements and content to mask." *Id.*

3       The Clarity tool can take this data and combine it with other information from

4   the owner's website to make a "simulation video of how a user interacts with a

5   website." CAC ¶ 53. Note that this is *not* a video *recording* of the user's interactions;

6   rather it is an illustration, recreated from the specific data Clarity collects. *See id.*

7   Additionally, by aggregating mouse clicks, gestures, and other interactions from a

8   large sample of website visitors, Clarity allows a website owner to see—via

9   "heatmaps"—where on its website users may experience issues that interfere with

10  the user experience. CAC ¶ 54.

11          **C.**    **Carnival's Privacy Notice Tells Visitors When and How**
                              **Carnival Collects Information.**

12

13      Carnival discloses to visitors to its website the information it collects,

14  including through the Clarity tool. Specifically, Carnival's Privacy Notice informs

15  visitors it may collect data on carnival.com and through its applications:

16      This Privacy Notice applies to our websites and applications, including
    Carnival.com and the HubApp and any other website, mobile application, or

17      other online service that links to this Notice (collectively, our "Sites") and
    ***describes how we collect, use and process your personal information in***

18      ***connection*** with our Sites, marketing and promotional activities and your
    interactions with us before, during and after one of our vacation experiences

19      (collectively with our Sites, our "Services").

20  *See* https://www.carnival.com/about-carnival/legal-notice/privacy-notice (emphasis
added).[1]

21      The Privacy Notice also informs visitors of the types of information Carnival

22  may collect, including information on how visitors access and use Carnival's

23  _____

24  [1] Because Plaintiffs' Complaint "depends on the contents of" carnival.com, "the
incorporation by reference doctrine" allows the court, when evaluating Carnival's

25  motion to dismiss, to consider Plaintiffs' allegations "in the context" of the full
website. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("The rationale of

26  the 'incorporation by reference' doctrine applies with equal force to internet pages as
it does to printed material.").

27

28  - 4 -

CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

services, about the type of computer visitors use, and analytics information (*e.g.*, data that allows Carnival to "track traffic and usage trends"). *Id.* It further informs users that Carnival may use "third-party analytics tools" to collect this data:

> We typically collect this information through a variety of tracking technologies, including cookies, Flash objects, web beacons, embedded scripts, APIs and mobile software development kits (SDKs), location-identifying technologies, and similar technology (collectively, "tracking technologies"), and we may use third party services to collect this information. Information we collect automatically about you may be combined with other personal information we collect directly or receive from other sources.
>
> Specifically, we and our third party partners may use tracking technologies to automatically collect commercial information, preferences, and internet, network and device information, including:
>
> - **Information about how you access the Service,** such as the site from which you came and the site to which you are going when you leave our Sites, how frequently you access the Service, when and whether you open emails or click the links contained in emails, whether you access the Service from multiple devices and other actions you take on the Service.
>
> - **Information about how you use the Service,** such as the pages you visit, the links you click, the ads you view and click on, purchase information and your checkout process, your location when you access or interact with our Service, and other similar actions.
>
> - **Information about the computer, tablet, smartphone or other device you use,** such as your IP address, browser type, Internet service provider, platform type, device type/model/manufacturer, operating system, date and time stamp, a unique ID that allows us to uniquely identify your browser, mobile device or your account (including, e.g., a persistent device identifier or an Ad ID), and other such information.
>
> - **Analytics information.** We may collect analytics data, or use third party analytics tools, to help us measure traffic and usage trends for the Service and to understand more about the demographics and behaviors of our users. We may also use analytics tools to record your mouse movements, scrolling, clicks and keystroke activity on our Sites to understand how our users engage with our Sites and to monitor and improve our online offerings.

*Id.* Carnival further discloses that it collects this information "to improve your customer experience" and that it may use it to "monitor the effectiveness of our Service," "perform analytics and detect usage patterns on our Service," "diagnose or

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

1  fix technology problems," and "detect or prevent fraud or other harmful activities."

2  *Id.*

3  Visitors can access the Privacy Notice on carnival.com. When a visitor first

4  lands on carnival.com, the website presents a blue pop-up banner that overlays the

5  bottom of the visitor's web browser window, titled "Cookie Policy" that informs the

6  visitor that the website captures information about the user's visit to, among other

7  things, to "analyze our traffic":

8

9

10

11

12

13

14

15



16

17  *See* Declaration of Jacob M. Heath, Ex. A.[2]  The underlined language in the pop-up

18  banner invites the user to read more links to the Privacy Notice itself. The pop-up

19  banner persists at the bottom of the carnival.com website as a visitor navigates the

20  site, even if they click through different pages. The banner persists even after the

21  visitor clicks the Privacy Notice; it does not disappear until the visitor affirmatively

22  closes it by clicking the "x" on the upper-right-corner of the banner. Even after the

23  _____

24  [2] The exact formatting of the banner shown above has varied over time, though not
    in any material way.  Because Plaintiffs' Complaint does not specify when they
    supposedly visited carnival.com, *see* CAC ¶ 64, is it impossible to be sure exactly

25  which version of the banner they saw during their visit. To the extent Plaintiffs
    believe that the version they saw differed in a material way from the one pictured

26  above, Carnival invites them to explain how and why they think that difference
    matters.

27                                                           CARNIVAL's MOTION TO
                                                                    DISMISS
28                          - 6 -                              3:23-CV-00236

user closes the pop-up banner, a link to the Privacy Notice is available through a hyperlink contained in a blue bar across the bottom of the website.

**D.** **Plaintiffs Use Carnival's Website To Provide Carnival With Information, Then Sue Carnival For Keeping Track Of That Same Information.**

Plaintiffs claim to have "visited carnival.com and certain of its subpages on their computers and/or smartphones," CAC ¶ 64, to "request[] and submit[] information related to" planning trips, CAC ¶¶ 5-9. Plaintiff Rubridge, for instance, claims to have interacted with carnival.com to make "inquiries related to cabin and ship details (including the pricing and size of cabins)," and to provide "information to Carnival, including his name, phone number, email address, trips that interested him, and departing port information." CAC ¶ 8. Plaintiff Price similarly says that she "input information about potential trips she was planning" and "used her mouse to hover and click on certain links and items." CAC ¶ 5. Nevertheless, despite interacting with carnival.com specifically for the purpose of providing information to Carnival, and receiving other information in exchange, Plaintiffs claim to have been wholly unaware that Carnival would be keeping track of those interactions or the information they conveyed. *See* CAC ¶ 66. On that basis, Plaintiffs sued Carnival alleging that it "unlawfully intercept[ed] [their] communications" "any time they visit[ed] Defendant's website with Session Reply Code enabled." CAC ¶ 127. They also claim that this same conduct invaded their privacy in a way that was "highly objectionable" and "an egregious breach of … social norms," CAC ¶ 122. While Plaintiffs initially filed five separate lawsuits in federal courts in four different states, in light of the factual and legal overlap across the different cases, the parties agreed to have the actions transferred to and consolidated in this Court.

- 7 -

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

III.   **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). While a court must accept all material factual allegations as true, it is not required to accept as true any allegations that are contradicted by matters that are subject to judicial notice, that are exhibits to a complaint, or that are incorporated by reference in a complaint. *See, e.g.*, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014).

IV.   **LEGAL ARGUMENT**

   A.   **Plaintiffs Fails To State A Wiretapping Claim (Counts I, II, IV, VI & VII).**

Although Plaintiffs bring claims under five separate wiretapping statutes, each of those statutes is analogous to (or is) the Federal Wiretap Act, which makes it a crime to "intentionally intercept[]"—i.e., to use an "electronic, mechanical, or other device" to "acqui[re] the contents of," 18 U.S.C. § 2510(4)—any "wire, oral, or electronic communication," 18 U.S.C. § 2511(1).[3] Accordingly, the elements of each

---

[3] *See, e.g.*, *Pena v. GameStop, Inc.*, 2023 WL 3170047, at *3 (S.D. Cal. 2023) ("'The analysis for a violation of CIPA [Cal. Penal Code § 631] is the same as that under the federal Wiretap Act.'"); *Com. v. Blystone*, 519 Pa. 450, 464–65 (1988) *aff'd sub nom.* *Blystone v. Pennsylvania*, 494 U.S. 299 (1990) ("[T]he Pennsylvania wiretapping statute is based on its federal counterpart, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2016."); *Davis v. State*, 43 A.3d 1044, 1051 (Md. 2012) ("[I]t is clear through both legislative history and case precedent that the federal wiretap statute … served as the guiding light for the Maryland Act; therefore, we read the acts in pari materia. Because of the similarities, we look to apt federal courts cases for persuasive guidance interpreting analogous provisions of the Maryland statute."); *Com. v. Vitello*, 367 Mass. 224, 251 (1975) ("[I]n substance the requirements of the Massachusetts statute are the same as those of Title III [the

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

of the five wiretapping claims here largely track those of the Federal Wiretap Act: namely, that the defendant (1) acting without consent "(2) intentionally intercepted (3) the contents of plaintiffs' electronic communications (4) using a device." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *10 (N.D. Cal. 2022) (numbering altered).  Here, Plaintiffs fail to plead facts establishing any of those elements.

> 1. *Plaintiffs fail to plead facts showing that Carnival acted without consent.*

Each of the wiretapping statutes at issue here applies only when the defendant acts *without* consent.[4]  Courts have been clear that consent, in this context, need not be express, but may instead be implied by the surrounding circumstances—such as when a person "leav[es] a message on an ordinary answering machine," or continues with a phone call "following [a] warning that the call 'may be monitored or recorded.'"  *Commonwealth v. Byrd*, 235 A.3d 311, 319-20 (Pa. 2020); *see also, e.g.,* *Briddell v. State*, 2016 WL 4698158, at *4 (Md. Ct. Spec. App. 2016) (similar).  As long as "the person being recorded knew or should have known, that the conversation

---

Federal Wiretap Act], as the legislative history of Title III shows that they should be.").

[4] 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception"); Cal. Penal Code § 631(a) (making it a crime to intercept a communication only "without the consent of all parties to the communication"); 18 Pa. Stat. § 5704(4) ("It shall not be unlawful … [for a] person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception."); Mass. Gen. Laws Ann. ch. 272, § 99(B)(4) (providing that "a person given prior authority by all parties to such communication" may intercept it without liability); Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3) ("It is lawful under this subtitle for a person to intercept a wire, oral, or electronic communication where the person is a party to the communication and where all of the parties to the communication have given prior consent.").

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

1   was being recorded" it is not unlawful to record them. *Byrd*, 235 A.3d at 319.[5]

2   "[A]ctual knowledge" of the recording is not required; so long as a "reasonably

3   intelligent person" would have understood that the recording was happening, there is

4   no wiretapping violation. *Id.* at 319-20; *see also supra* n.5.

5          Accordingly, courts have held that even "the very act of sending a

6   communication over the Internet" can provide "express[] consent[] to the recording

7   of the message," because an "objective[ly] reasonable person" would understand that

8   communications over the internet are, by their nature, subject to recording. *Byrd*,

9   235 A.3d at 320 (quoting *Commonwealth v. Cruttenden*, 58 A.3d 95, 98 (Pa. 2012));

10  *see also, e.g.*, *People v. Nakai*, 183 Cal. App. 4th 499, 518 (2010) (holding that the

11  nature of an internet communication is such that a person should "reasonably expect

12  that the communication may be overheard or recorded").  After all, when a person

13  interacts with a website, the natural assumption—indeed, the expected behavior—is

14  that the website will keep track of those interactions.  That is how websites adapt to

15  user preferences, allow users to resume interactions that they began during previous

16  sessions, and provide support to users who are encountering difficulties.  Indeed, it

17  is hard to imagine how the modern internet would function if websites were *not*

18  keeping track of how users interacted with them.

19

20  [5] *See also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014)

21  ("'[C]onsent [under the Wiretap Act] may be implied where there are surrounding circumstances indicating that the defendant knowingly agreed to the surveillance.'"

22  (quoting *U.S. v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004)); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4 (N.D. Cal. 2021) (consent under Cal. Penal Code § 631(a) will

23  be found where "a reasonably prudent user would have been aware" of the recording); *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) ("If

24  recordings are not made 'secretly,' they do not constitute an interception within the meaning of the act."); *Briddell*, 2016 WL 4698158, at *4 ("Prior to placing the call,

25  an automated message informed Briddell: 'This call will be recorded and subject to

26  monitoring at any time.' Briddell consented to the call by continuing to speak after the 'this is being recorded' message was played.").

27

28                                    CARNIVAL's MOTION TO
                                      DISMISS
                    - 10 -             3:23-CV-00236

1    Plaintiffs thus consented to Carnival's tracking of their interactions with its
2    website, by continuing to use carnival.com in a circumstance where any "reasonably
3    intelligent person," *Byrd*, 235 A.3d at 319-20, would have understood that her
4    interactions with the website were being recorded.  As an initial matter, Plaintiffs
5    here were not just engaging in interactions "over the Internet," *Cruttenden*, 58 A.3d
6    at 98, they were using those internet interactions to actively share information with
7    Carnival.  *See, e.g.*, CAC ¶ 8 (alleging that Plaintiff Rubridge intentionally "provided
8    … personal information to Carnival, including his name, phone number, email
9    address, trips that interested him, and departing port information").  Indeed, Plaintiffs
10   intentionally provided information to Carnival via its website, with the specific
11   expectation that Carnival would keep track of that information and use it to provide
12   information back to Plaintiffs, which would allow them to plan future trips.  *See, e.g.*,
13   CAC ¶¶ 5-9.  It thus would have been not just surprising, but directly contrary to
14   Plaintiffs' purpose, if Carnival had not been tracking their interactions with its
15   website and the information those interactions conveyed.  Accordingly, Plaintiffs'
16   "very act" of sharing information with Carnival's website—which any "objective[ly]
17   reasonable person" would know is subject to recording—necessarily means Plaintiffs
18   "expressly consent[ed] to the recording of" the information shared.  *Cruttenden*, 58
19   A.3d at 98.

20   But, it is more than just circumstances of the interaction from which consent
21   can be implied.  Here, Carnival also provided specific notice that Plaintiffs'
22   interactions with its website were subject to tracking.  Indeed, as shown above, *see*
23   *supra* § I.C, immediately upon landing on carnival.com Plaintiffs would have been
24   presented with a prominent cookie banner, informing them that carnival.com "use[s]
25   cookies to personalize content and ads, to provide social media features and to
26   analyze our traffic."  At the end of that short disclosure was a link to learn more,

27
28                                    - 11 -

which if clicked would have taken Plaintiffs to the carnival.com Privacy Notice. This was not some elusive link buried at the bottom of the page or hidden in obscurity. Rather, it would have persisted at the bottom of carnival.com until Plaintiffs affirmatively closed the notice by clicking the "X" in its upper right-hand corner. Indeed, until Plaintiffs did so, the banner would have continued to follow them as they navigated carnival.com, reminding them that a Privacy Notice existed and where they could find it.

As for the Privacy Notice, it specified the type of information that carnival.com may collect, including: "pages you visit, the links you click, the ads you view and click on, purchase information and your checkout process, your location when you access or interact with our Service, and other similar actions." *See supra* § I.C. Further, the Privacy Notice stated that Carnival may engage outside companies like Microsoft to assist with data collection and analysis. *Id.* Importantly, the Privacy Notice reminds users that by "using our Services" they "acknowledge that [they] have read, understood and agree to the terms of this Privacy & Cookies Notice." *See id.*

All of this thus belies Plaintiffs' conclusory allegation that they "did not consent to any of Carnival's actions in intercepting, reading, and learning the contents of their communications." CAC ¶ 108; *see Iqbal*, 556 U.S. at 678 (conclusory allegations generally need not be credited); *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052, n.1 (9th Cir. 2023) (especially where they are contradicted by evidence incorporated by reference into the complaint). Between the fact that they were interacting over the internet generally, providing information to Carnival specifically through its website, and doing so after being presented with the prominent disclosures on carnival.com's banner—which appeared immediately upon Plaintiffs' arrival at www.carnival.com—Plaintiffs (or at least a reasonably intelligent person in their position) would have been aware from the jump that Carnival would be keeping track

CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

1  of their interactions on its website.  And so by continuing to use that website in spite

2  of that knowledge (actual or constructive), Plaintiffs consented to exactly the acts

3  they describe in their Complaint.  For this reason alone, their wiretapping claims fail.

4           2.    *Plaintiffs fail to plead facts showing that Carnival*
               *"intercepted" a communication.*

5

6        Regardless of consent, the wiretapping laws at issue here apply only to a

7  defendant who (among other things) "intercepted" a communication, 18 U.S.C.

8  § 2511(1)[6]—*i.e.*, "acqui[red]" the communication "contemporaneous with [its]

9  transmission." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).

10  Accordingly, to survive a motion to dismiss, a wiretapping claim must allege facts

11  showing that the defendant read or acquired the communication while it was en route

12  to its destination—not before it left or after it had already arrived.  *See, e.g., Pena v.*

13  *GameStop, Inc.*, 2023 WL 3170047, at *6 (S.D. Cal. 2023) (dismissing wiretapping

14  claims for failure to plead facts showing "that the communications in question were

15  acquired 'in transit' such that they were 'intercepted'"); *Rosenow v. Facebook, Inc.*,

16  2020 WL 1984062, at *7 (S.D. Cal. 2020) (similar); *Underhill v. Kornblum*, 2017

17  WL 2869734, at *5 (S.D. Cal. 2017) (similar).  Conclusory assertions that merely

18  recite that the communications were acquired "during transmission" or "in real time"

19  are insufficient. *See In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204,

20  1228 (C.D. Cal. 2017) (dismissing wiretapping claim because allegations that

21  defendant "intercepted their communications … 'during transmission'" were too

---

[6] 18 Pa. Stat. § 5703(1) (making it a crime to "intentionally ***intercept***[] … any wire, electronic or oral communication" (emphasis added)); Md. Code Ann., Cts. & Jud. Proc. § 10-402 (making it a crime to "[w]illfully ***intercept*** … any wire, oral, or electronic communication" (emphasis added)); Mass. Gen. Laws Ann. ch. 272, § 99(C)(1) (making it a crime to "willfully commit[] an ***interception*** … of any wire or oral communication" (emphasis added)); Cal. Penal Code § 631 (making it unlawful to "read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is ***in transit***" (emphasis added)).

CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

- 13 -

1   conclusory).   Rather, a complaint must "articulate[] with sufficient clarity when
2   [defendant] supposedly intercepted their communications." *Id.*

3       Courts have explained, however, that interception is inimical in cases
4   involving electronic communications.  That is because electronic communications
5   "are not typically intercepted during transmission," but rather are almost always
6   acquired either before the information leaves the sender's computer or after it arrives
7   at the recipient's. *Martin v. Sephora USA, Inc.*, 2023 WL 2717636, at *10 (E.D. Cal.
8   2023).  Consider the example of an email:  Suppose a person spends twenty minutes
9   typing a draft email on her computer, before finally hitting the "Send" button, at
10  which point the email is transmitted nearly instantaneously to the intended recipient's
11  inbox, where it waits to be read.  The only time when the email is "in transit" is during
12  the "seconds or mili-seconds … following [the] send command" before it reaches the
13  recipient's inbox. *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 938, 952
14  (N.D. Cal. 2014) (quoting *United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir.
15  2003)).  The email is not "in transit"—and thus it is not a violation of the wiretapping
16  laws to read the email's contents—during either the time before the writer pushes
17  "Send" or the time after the email arrives at its destination. *See id.*

18      Plaintiffs here provide no well-pled factual allegations that would show that
19  Clarity accessed Plaintiffs' information while it was traveling to Carnival, as opposed
20  to before it left Plaintiffs' devices or after it had reached its destination.   The
21  Complaint is not saved by its bare assertions that Plaintiffs' "electronic
22  communications are intercepted contemporaneously with their transmission," or "in
23  real time." CAC ¶¶ 138-39, 169-70, 195-96.  These allegations are indistinguishable
24  from those that courts have already found lacking. *See Licea v. Cinmar, LLC*, 2023
25  WL 2415592, at *10 (C.D. Cal. 2023) ("Plaintiffs must provide more than conclusory
26  allegations that messages were 'intercepted in real time.'"); *Licea v. Am. Eagle*

27
28                              CARNIVAL's MOTION TO
                                       DISMISS
                    - 14 -            3:23-CV-00236

*Outfitters, Inc.*, 2023 WL 2469630, at \*9 (C.D. Cal. 2023) (same); *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d at 1228; *Underhill*, 2017 WL 2869734, at \*4.

To the extent Plaintiffs do provide factual allegations about how or when the purported acquisition occurred, they tend to affirmatively ***refute*** any suggestion that it occurred during transit. Plaintiffs allege, for instance, that the Clarity code that supposedly performed the recording "deploys on each website visitor's internet browser." CAC ¶ 1. That it operates on the internet browser from the website visitor's computer necessarily means the code acts ***locally***; that is, on Plaintiffs' devices ***before*** the information was transmitted to Carnival, and not (like a wiretap) on the wires in between. Plaintiffs confirm this when they allege that the Clarity code captures information ***even if it is never sent to Carnival at all***. *E.g.*, CAC ¶ 35 (alleging that session replay code will record "if a user writes information into a text form field, but then chooses not to click a 'submit' or 'enter' button on the website"). In other words, Plaintiffs' own allegations make clear that the alleged interception ***cannot*** occur during transmission of the information, because it occurs even if the information is never transmitted at all. Plaintiffs have thus "plead[ed] [themselves] out of court, by alleging facts which show that [they] ha[ve] no claim." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 989 (9th Cir. 2001). For this separate reason, Plaintiffs' wiretapping claims all fail.

3. *Plaintiffs fail to plead facts showing that Carnival accessed the "contents" of any message.*

In addition to the requirements discussed above, the wiretapping laws at issue here impose liability only where a defendant "acqui[res] … the ***contents*** of any wire,

- 15 -

1  electronic or oral communication." 18 U.S.C. 2510(4) (emphasis added).[7]

2  "Contents" means "information concerning the substance, purport, or meaning of [a]

3  communication." 18 U.S.C. § 2510(8). Accordingly, a defendant violates the

4  wiretapping laws only if it accesses the substantive contents of a message. *See, e.g.,*

5  *In re Zynga Privacy Litig.*, 750 F. 3d 1098, 1106 (9th Cir. 2014) (affirming dismissal

6  of wiretapping claim for failure to plead facts showing that "contents" were

7  accessed). For that to be the case, two things must be true: (1) a plaintiff must have

8  intended to convey a substantive message, and (2) an unauthorized party must have

9  accessed (or attempted to access) that substance, and not mere "record information,"

10 like a person's name or address. *See In re iPhone Application Litig.*, 844 F. Supp.

11 2d 1040, 1061 (N.D. Cal. 2012) (holding, under the Federal Wiretap Act, that "data"

12 that is "generated" without the communicative "intent of the user" cannot "constitute

13 'content' susceptible to interception").

14     The Complaint, however, fails to plead facts showing that Carnival (or

15 Microsoft) accessed the substantive "contents" of each Plaintiffs' communication—

16 i.e., "the intended message conveyed by the communication." *See In re Zynga*, 750

17 F. 3d at 1106. Plaintiffs allege generally that the "communicat[ions]" that were

18 recorded were their "us[e] [of] their mouse to hover and click on certain links and

19 items." CAC ¶ 67.[8] But courts have squarely (and recently) rejected that exact

20

---

21 [7] 18 Pa. Stat. § 5702 (requiring the "acquisition of the **contents** of any wire, electronic
   or oral communication" (emphasis added)); Md. Code Ann., Cts. & Jud. Proc. § 10-
22 401(10) (same); Mass. Gen. Laws ch. 272, § 99(B)(4) (requiring the acquisition
   of "the **contents** of any wire or oral communication" (emphasis added)); Cal. Penal
23 Code § 631 (making it unlawful to "read[], or attempt[] to read, or to learn **the
   contents** or meaning of any message, report, or communication" (emphasis added)).

24 [8] Actually, Plaintiff Hernandez does not even allege this, as (unlike all the other
25 Plaintiffs) she provides **no information** about what interactions (if any) she had on
   carnival.com that were supposedly recorded. *Compare* CAC ¶ 7, *with* CAC ¶¶ 5-6,
26 8-9. Accordingly, her wiretapping claim (and, because she is the only named Plaintiff

27

28                                        - 16 -       CARNIVAL's MOTION TO
                                                       DISMISS
                                                       3:23-CV-00236

1    theory, explaining that "[n]avigating through a website's multiple pages is not the

2    substance of a communication; it's an action taken to go to a digital location." *Cook*,

3    2023 WL 5529772, at *8.  As such, mouse movements are nothing more than "the

4    cyber analog to record information"—indeed, "these movements and clicks literally

5    constitute a record of [a person's] movements within a digital space"—not protected

6    by the wiretapping laws. *Id.*

7        They also claim that Carnival obtained non-communication information such

8    as "the date a user visited the website, the device the user accessed the website on,

9    the type of browser the user accessed the website on, the operating system of the

10   device used to access the website, [and] the country where the user accessed the

11   website from."  CAC ¶ 52.  But none of that information indicates a substantive

12   message that "Plaintiff[s] intended to communicate." *Gonzales v. Uber Techs., Inc.*,

13   305 F. Supp. 3d 1078, 1085 (N.D. Cal. 2018).  To the contrary, those pieces of

14   information reflect, at most, "data about [a] communication"—not the contents of the

15   communication itself. *See id.* at 1084.  Just as information about the "number from

16   which [a telephone call] was made" says nothing about the message communicated

17   during that call, *id.*, the device and browser that Plaintiffs used says nothing about

18   any messages they sent while using that device and browser.  Similarly, just as the

19   finger movements used to dial a number on a telephone reveal nothing about the

20   message communicated on the phone call, *see id.*, the mouse movements used to

21   navigate around carnival.com reveal nothing about any message that Plaintiffs

22   intended to communicate to Carnival.

23       And while Plaintiffs Mikulsky and Rubridge allege more specific types of

24   information that they provided via carnival.com, none of that information qualifies

25   _____

26   who is a member of it, the claims of the putative Maryland class) must be dismissed
     for this reason.

27                                                    CARNIVAL's MOTION TO

28                              - 17 -                         DISMISS
                                                        3:23-CV-00236

as the "contents" of a communication either. Plaintiff Mikulsky, for instance, alleges that she provided "passport numbers," "names," and "birthdays." CAC ¶ 6. But none of that information is the substantive contents of a message; rather, it is all routine "record information," no different from the "names," "addresses," "date[s]," and "ID numbers[s]" that courts have already held not to qualify as substantive message "contents." *See Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 729 (N.D. Cal. 2014). The same is true of Plaintiff Rubridge's allegation that he provided "name, phone number, email address, trips that interested him, and departing port information." CAC ¶ 8. The first three types of information have been squarely held not to be contents. *Svenson*, 65 F. Supp. 3d at 729. And the latter two are simply forms of "'geographic location'" information, which has "'likewise been deemed to be non-content information.'" *Gonzalez*, 305 F. Supp. 1078, 1085 (quoting *In re Carrier IQ, Inc.*, 78 F.Supp.3d 1051, 1082 (N.D. Cal. 2015)).

Plaintiffs thus fail to not allege any substantive message that they meant to communicate—much less one that was captured by Carnival or Microsoft—so their wiretapping claims also fail for this independent reason.

4.   *Plaintiffs fail to plead facts showing that Carnival used a "device" to accomplish the supposed interception.*

Independent of all the above requirements, the wiretapping laws at issue here also apply only where a defendant acquires the contents of a communication "through the use of any electronic, mechanical, or other device." 18 U.S.C. 2510(4).[9] "[E]lectronic, mechanical, or other device" is in turn defined to mean "any device or

---

[9] This is true of the Federal law, along with Pennsylvania's, Maryland's, and Massachusetts's. 18 Pa. Stat. § 5702 (requiring the "acquisition of [a] communication through the use of any electronic, mechanical or other *device*" (emphasis added)); Md. Code Ann., Cts. & Jud. Proc. § 10-401(3) (same); Mass. Gen. Laws Ann. ch. 272, § 99(B)(4) (requiring acquisition "through the use of any intercepting *device*" (emphasis added)). California's wiretapping law does not include the device limitation, and so is not affected by this section of this brief.

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

- 18 -

apparatus which can be used to intercept a wire, oral, or electronics communication." 18 U.S.C. § 2510(5). Plaintiffs' wiretapping claims are premised on the assumption that Microsoft's "Session Reply Code" is a "device" within the meaning of the statute. CAC ¶ 91. But the "proper definition" of a statutory term is a "[p]urely legal question." *Freeman v. Gonzales*, 444 F.3d 1031, 1037 (9th Cir. 2006). The fact that the Complaint alleges that "[c]ode" is a "device," CAC ¶ 91, is thus immaterial; it is a legal conclusion for this Court to decide. *See Iqbal*, 556 U.S. at 678-79 (courts, even at the motion-to-dismiss stage, "are not bound to accept … a legal conclusion" as true). Here, statutory text and context both make clear that the wiretapping laws use the term "device" in a way that connotes a physical object, and hence excludes the computer code alleged by the Complaint.

By using the term "device" without specifically defining it, the wiretapping laws direct courts to apply its ordinary meaning. *In re Stevens*, 15 F.4th 1214, 1217 (9th Cir. 2021) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *accord, e.g.*, *Osprey Portfolio, LLC v. Izett*, 620 Pa. 274, 283 (2013); *Town of Boylston v. Comm'r of Revenue*, 434 Mass. 398, 405 (2001); *Schreyer v. Chaplain*, 416 Md. 94, 108 (2010). And a "device," in common parlance, is "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." Webster's Third New International Dictionary of the English Language Unabridged 618 (2002); *see also Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 136 F.3d 819, 822 (D.C. Cir. 1998). That definition—and particularly, its references to "equipment" or "a mechanism"— connotes a physical object.

That straightforward reading is confirmed by the context in which the term "device" appears. The Federal, Pennsylvania, and Maryland wiretap laws, for instance, make it unlawful to (among other things) "manufacture[]," or "assemble[],"

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

a "device" that is primarily used for wiretapping.  18 U.S.C. § 2512(1)(b); *accord* 18 Pa. Stat. § 5705(3); Md. Code Ann., Cts. & Jud. Proc. § 10-403(1).  Massachusetts's law similarly regulates the "installation" of a device in various circumstances, including "mak[ing] a secret entry upon a private place and premises in order to install [such a] device."  Mass. Gen. Laws Ann. ch. 272, § 99(F)(2)(g).  While one could readily do all of those things to physical objects, it would be odd and inappropriate word choice—and in some cases, impossible—to apply those verbs to intangible software code.  Similarly, to the extent the wiretapping laws provide examples of "devices," they uniformly list only physical (not intangible) objects. Pennsylvania's law, for instance, expressly lists "an induction coil"—i.e., a physical coil of wire, that can pick up on telephone signals—as an example of a "device." 18 Pa. Stat. § 5702.  Likewise, all the wiretapping laws at issue here include express carveouts that prevent liability from attaching to a "hearing aid or similar device" or "telephone … equipment"—indicating that the term "device" would otherwise (i.e., absent this carveout) target physical objects like hearing aids and telephone equipment.  *See* 18 U.S.C. § 2510(5); 18 Pa. Stat. § 5702; Md. Code Ann., Cts. & Jud. Proc. § 10-401(4); Mass. Gen. Laws Ann. ch. 272, § 99(B)(3).  Conversely, none of the laws at issue here give any indication that they were meant to apply to intangible objects like computer code.

The plain language of the relevant statutes thus compels the conclusion that the term "device" does not include intangible computer code.  And because the "text is clear" that "ends" the matter.  *Poulsen v. Dept. of Def.*, 994 F.3d 1046, 1051 (9th Cir. 2021); *Commonwealth v. Mock*, 656 Pa. 174, 183 (2019); *Greco v. State*, 347 Md. 423, 428 (1997); *Wheatley v. Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 601 (2010).  But even if any ambiguity as to the scope of the wiretapping laws remained, because they are all criminal statutes, the rule of lenity would require

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

that ambiguity to be resolved in favor of a narrower reading—i.e., one that excludes computer code from the statutes' scope. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (lenity applies to noncriminal applications of a criminal statute).[10]  After all, basic due process considerations mean that a defendant should not be held to be a criminal unless it is crystal clear that his acts violated the law.  Here, where the wiretapping statutes give no indication that they are meant to apply to intangible computer code—and every indication to the contrary—that means that the Court should not extend them beyond their text in that way.

Because Plaintiffs' wiretapping claims are all premised on Carnival's use of computer code, which does not constitute a "device" within the meaning of the wiretap laws, their claims fail for this independent reason.

>     5.     *Plaintiffs' Federal Wiretap Act claim separately fails because Carnival is a party to the communications.*

In addition to all the reasons above, Plaintiffs' Federal Wiretap Act claim further fails because Carnival was a party to the communications at issue.  As courts have explained, the Federal Wiretap Act "contain[s] an exemption from liability for a person who is a 'party' to the communication." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) (citing 28 U.S.C. § 2511(2)(d)).  That is because the Federal Wiretap Act requires consent from only "one of the parties to the communication," 28 U.S.C. § 2511(2)(d), and so if it is a party itself that is performing the wiretapping, has necessarily consented to its own actions.

---

[10] *See also A.S. v. Pennsylvania State Police*, 636 Pa. 403, 422 (2016) (relying on *Leocal* to strictly interpret ambiguity in non-criminal law); *Noe v. Sex Offender Registry Bd.*, 2017 WL 1275358, at *12 (Mass. Super. 2017) (applying the rule of lenity "to civil statutes where a 'violation of the statute may trigger criminal penalties'"), *aff'd*, 480 Mass. 195 (2018); *Bourgeois v. Live Nation Ent., Inc.*, 430 Md. 14, 37 (2013) (accepting as a premise that rule of lenity applied to civil application of criminal statutes).

CARNIVAL's MOTION TO DISMISS
3:23-CV-00236

1    Here, Plaintiffs do not dispute that Carnival was a party to the
2    communications.   To the contrary, Plaintiffs themselves allege that the relevant
3    "communications [were] with the Carnival website." CAC ¶ 1.  Nevertheless, they
4    insist that Carnival's "conduct falls outside the scope of [the party] exception[]" to
5    the Federal Wiretap Act, because "the crime-tort exception to the [party] exception
6    applies." CAC ¶ 97.

7    The crime-tort exception, however, has no application here.  That exception
8    states that a party can still be liable under the Federal Wiretap Act in the limited
9    circumstance where the party acts "for the purpose of committing any criminal or
10   tortious act in violation of the Constitution or laws of the United States or any State."
11   28 U.S.C. § 2511(2)(d).  As that text indicates, the crime-tort exception applies only
12   if Plaintiffs can "show that the ***purpose*** for [Carnival's] interception was to injure
13   plaintiffs tortiously." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *12
14   (N.D. Cal. 2022) (emphasis added).  It is thus not enough to show just that Carnival
15   committed a wiretap (although, as explained above, Plaintiffs have not even done
16   that); instead, Plaintiffs must plead facts showing that Carnival's ***aim*** in committing
17   that wiretap was "'to perpetuate torts on millions of Internet users.'" *Id.* (quoting *In*
18   *re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 n.13 (N.D. Cal. 2014) (Koh,
19   J.)).   Accordingly, if the facts simply suggest that "the defendant's primary
20   motivation was to make money," as opposed to "injur[ing] plaintiffs tortiously," the
21   "crime-tort exception to the Wiretap Act is inapplicable." *Id.*  That is exactly the
22   case here.  The obvious motivation for capturing website visitors' interactions is to
23   improve website performance, provide better customer service, and ultimately sell
24   more cruises.  And in fact, Plaintiffs themselves specifically allege that Carnival
25   "used" the Session Replay Code "for commercial gain." CAC ¶ 96.  Accordingly,
26
27
28
                                    CARNIVAL's MOTION TO
                   - 22 -          DISMISS
                                    3:23-CV-00236

1  the crime-tort exception does not apply, and Plaintiffs' Federal Wiretap Act claim is

2  barred because Carnival was a party to the relevant communications.[11]

3  **B.   Plaintiffs Fail to State an Invasion of Privacy Claim (Counts III, V, VII & IX).**

4

5      Plaintiffs' invasion of privacy (sometimes called "intrusion upon seclusion")

6  claims have already been directly rejected by the caselaw.  Under every applicable

7  state's law, such a claim requires Plaintiffs to allege (among other requirements)

8  "conduct by the defendant that amounts to a serious invasion of [a] protected privacy

9  interest." *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 829 (N.D. Cal.

10  2020).[12]  And courts applying those states' laws have been clear that what Plaintiff

11  accuses Carnival of here—"collecting [her] keystrokes, mouse clicks, and PII"—"is

12  simply not the type of highly offensive act to which liability [for an intrusion upon

13

---

14  [11] Plaintiffs' conclusory assertion that "Carnival's primary purpose for deploying

15  Session Replay Code was to secretly, and without permission, collect data from
   users," CAC ¶ 99, should be disregarded.  For one thing, it is not a "well-pleaded

16  factual assertion," but rather a conclusory allegation "not entitled to the assumption
   of truth." *Iqbal*, 556 U.S. at 679.  But just as important, Plaintiffs' conclusory

17  assertion (even if it were credited) does not plead what would be required for the
   crime-tort exception to apply here—i.e., that Carnival's specific intent in utilizing

18  Clarity was to commit a tort.  In fact, Plaintiffs' assertion does not speak to Carnival's
   ultimate aim in deploying Clarity at all.  Instead, it says only that Carnival meant to

19  collect data.  But that will be true of *every* Federal Wiretap Act defendant; after all,
   the act applies only to those who act "intentionally."  18 U.S.C. § 2511(1)(a).  And

20  so if Plaintiffs' conclusory assertion that Carnival acted with the aim of secretly
   collecting data were enough to trigger the crime-tort exception, then that exception

21  would apply in *every* Federal Wiretap Act case—a result clearly rejected by the
   caselaw cited above in text, which makes clear that the crime-tort exception is narrow

22  and rarely applicable.

23

24  [12] *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 122 (W.D. Pa. 2019);
   *Branyan v. Sw. Airlines Co.*, 105 F. Supp. 3d 120, 126 (D. Mass. 2015) ("In order to

25  prevail on a claim alleging an invasion of privacy, a plaintiff must prove that there
   was … an unreasonable, substantial or serious interference with his privacy."); *see*

26  *also Demo v. Kirksey*, 2018 WL 5994995, at *3 (D. Md. 2018) ("Maryland and
   Pennsylvania have adopted the same definition for intrusion upon seclusion.").

27

28                                        - 23 -

1  seclusion claim] can attach." *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108,

2  122 (W.D. Pa. 2019).

3      That is because to be "highly offensive" under the relevant laws, an act must

4  be "of the sort which would cause mental suffering, shame or humiliation to a person

5  of ordinary sensibilities." *Chicarella v. Passant*, 494 A.2d 1109, 1114 (Pa. Super.

6  1985). That is a high bar—even collection of "plaintiff's HIV status," *McNemar v.

7  The Disney Store, Inc.*, 91 F.3d 610, 622 (3d. Cir. 1996), or "disclosure of personal

8  information, including social security numbers," does not meet it. *Low v. LinkedIn

9  Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012). "[C]ollection—and even

10  disclosure to certain third parties—of" more anodyne personal information certainly

11  falls well below the requisite threshold. *In re Google Assistant Privacy Litig.*, 457 F.

12  Supp. 3d at 829-30; *see also In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d

13  968, 988 (N.D. Cal. 2014) (no intrusion claim based on collection and disclosure of

14  users' data, including browsing histories); *Low*, 900 F. Supp. 2d at 1025 (no "highly

15  offensive" invasion of privacy by disclosing users' browsing histories to third

16  parties). That is especially so where the defendant acted with "legitimate

17  countervailing business interests," because "obviously" the law "was not intended to

18  prohibit" acts "which are reasonable or justified." *Squeri v. Mount Ida Coll.*, 2019

19  WL 2249722, at *2 (D. Mass. 2019), *aff'd*, 954 F.3d 56 (1st Cir. 2020).

20      Accordingly, where, as here, a defendant does nothing more than engage in

21  "routine commercial behavior," it does not commit an invasion of privacy. *In re

22  Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 830; *see also Branyan*, 105 F. Supp.

23  3d at 126 (where "legitimate business reasons for the reasonable collection or

24  dissemination" of information exist, the collection or dissemination is "not

25  actionable"). That is because nothing about the mere tracking of mouse movements

26  "to hover and click on certain links and items" on a cruise line website, CAC ¶ 67,

27

28
                                                - 24 -          CARNIVAL's MOTION TO
DISMISS
3:23-CV-00236

1  would cause any reasonable person the mental suffering, shame, or humiliation
2  required to state a claim for invasion of privacy.  After all, nothing about browsing a
3  (very popular) travel site is even remotely shameful or humiliating—or indeed, even
4  particularly personal or private at all.  Rather, what Plaintiffs accuse Carnival of
5  doing—collecting innocuous information (name, address, telephone number), which
6  Plaintiffs themselves freely shared with Carnival—happens on countless websites.
7  And indeed, it happens for exceedingly justifiable reasons—to improve website
8  performance and provide users with better service.  Because the Complaint has
9  alleged no facts that mark Carnival's conduct as being particularly egregious, and
10 certainly no facts rising even to the level of wrongful disclosure of Social Security
11 Numbers or HIV status, Plaintiffs' invasion of privacy claims fail.

12 **V.    CONCLUSION**

13        The Court should dismiss the Consolidated Class Action Complaint with
14 prejudice.

16 Dated:        September 6, 2023

17                                          By:_____/s/ Jacob M. Heath_____
18                                                         Jacob M. Heath
                                                  ORRICK, HERRINGTON &
19                                                      SUTCLIFFE LLP
                                               Attorneys for Defendant Carnival
20                                                        Corporation

27                                                         CARNIVAL's MOTION TO
                                                                    DISMISS
28                          - 25 -                           3:23-CV-00236