JACOB HEATH (STATE BAR NO. 238959)
jheath@orrick.com
ARAVIND SWAMINATHAN (*pro hac vice forthcoming*)
aswaminathan@orrick.com
REBECCA HARLOW (STATE BAR NO. 281931)
rharlow@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

Attorneys for Defendant
CARNIVAL CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDIA PRICE, ERICA MIKULSKY, MARILYN HERNANDEZ, DANIEL RUBRIDGE, and ARIEL OLIVER, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CARNIVAL CORPORATION,<br><br>Defendant. | Case No. 3:23-CV-00236-GPC-MSB<br><br>**DEFENDANT CARNIVAL CORPORATION'S MOTION TO DISMISS FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: January 12, 2024<br>Time: 1:30 p.m.<br><br>Judge: Hon. Gonzalo P. Curiel<br>Location: Courtroom 2D, 2d Floor |

## NOTICE OF MOTION AND MOTION TO DISMISS

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 12, 2024 at 1:30 p.m., or as soon thereafter as available, in the courtroom of the Honorable Gonzalo P. Curiel, located at Edward J. Schwartz United States Courthouse, 221 West Broadway, Courtroom 2D, 2d Floor, San Diego, California 92101, Defendant Carnival Corporation ("Carnival"), will and hereby does move to dismiss the Consolidated Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the pleadings and papers on file in this action, any other such matters of which the Court may take judicial notice, and any other matter that the Court may properly consider.

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION TO DISMISS ............................................. i

TABLE OF AUTHORITIES ............................................................................... iii

I.     INTRODUCTION ....................................................................................... 1

II.    SUMMARY OF RELEVANT FACTS ..................................................... 3

    A.    Carnival Uses Microsoft's Clarity Tool to Improve Visitors' Experiences On Its Website. ....................................................... 3

    B.    The Clarity Tool Can Track Mouse Clicks, Mouse Gestures, And Keystrokes To Improve Website Visitors' Experiences ................. 3

    C.    Carnival's Privacy Notice Tells Visitors When and How Carnival Collects Information. ....................................................... 4

    D.    Plaintiffs Use Carnival's Website To Provide Carnival With Information, Then Sue Carnival For Keeping Track Of That Same Information ..................................................................................... 6

III.    LEGAL STANDARD ............................................................................ 6

IV.    LEGAL ARGUMENT ........................................................................... 7

    A.    Plaintiffs Fails To State A Wiretapping Claim (Counts I, III, V, VII & IX). ................................................................................... 7

        1.    Plaintiffs fail to plead facts showing that Carnival acted without consent. ...................................................................... 7

        2.    Plaintiffs fail to plead facts showing that Carnival "intercepted" a communication. ..................................... 11

        3.    Plaintiffs fail to plead facts showing that Carnival accessed the "contents" of any message. ............................... 14

        4.    Plaintiffs fail to plead facts showing that Carnival used a "device" to accomplish the supposed interception. ................. 17

        5.    Plaintiffs' Federal Wiretap Act claim separately fails because Carnival is a party to the communications. ................................ 20

    B.    Plaintiffs Fail to State an Invasion of Privacy Claim (Counts IV, VI, VIII & X) ....................................................................... 22

    C.    Plaintiffs Fail to State a Computer Fraud and Abuse Act Claim (Count II) ....................................................................... 24

        1.    Plaintiffs fail to plead facts showing that Carnival exceeded its authorized access to Plaintiffs' computers. ................ 24

        2.    Plaintiffs fail to plead facts showing that Carnival caused losses of at least $5,000 or created a threat to public safety ..... 25

V.    CONCLUSION ...................................................................................... 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.S. v. Pennsylvania State Police*,
   636 Pa. 403 (2016)................................................................................. 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................6, 11, 18, 21, 24

*Bourgeois v. Live Nation Ent., Inc.*,
   430 Md. 14 (2013) ................................................................................. 19

*Branyan v. Sw. Airlines Co.*,
   105 F. Supp. 3d 120 (D. Mass. 2015)........................................................22, 23

*Briddell v. State*,
   2016 WL 4698158 (Md. Ct. Spec. App. 2016) .............................................. 8, 9

*In re Carrier IQ, Inc.*,
   78 F.Supp.3d 1051 (N.D. Cal. 2015) ......................................................... 16

*Chicarella v. Passant*,
   494 A.2d 1109 (Pa. Super. 1985) ............................................................ 22

*Colo. Republican Comm. v. Doe*,
   2016 WL 3922156 (D. Colo. 2016). .......................................................... 25

*Com. v. Blystone*,
   519 Pa. 450 (1988).................................................................................. 7

*Com. v. Vitello*,
   367 Mass. 224 (1975) .............................................................................. 7

*Commonwealth v. Byrd*,
   235 A.3d 311 (Pa. 2020)........................................................................ 8, 9

*Commonwealth v. Cruttenden*,
   58 A.3d 95 (Pa. 2012)........................................................................... 9, 10

*Commonwealth v. Mock*,
   656 Pa. 174 (2019)................................................................................ 19

*Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*,
  136 F.3d 819 (D.C. Cir. 1998) ........................................................................18

*Cook v. Gamestop, Inc.*,
  2023 WL 5529772 (W.D. Pa. Aug. 28, 2023) ...............................................2, 15

*Curtatone v. Barstool Sports, Inc.*,
  487 Mass. 655 (2021) ........................................................................................9

*Davis v. State*,
  43 A.3d 1044 (Md. 2012) ..................................................................................7

*Demo v. Kirksey*,
  2018 WL 5994995 (D. Md. 2018).....................................................................22

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ...........................................................................20

*In re Finjan Holdings, Inc.*,
  58 F.4th 1048 (9th Cir. 2023) ..........................................................................11

*Freeman v. Gonzales*,
  444 F.3d 1031 (9th Cir. 2006) .........................................................................17

*Gonzales v. Uber Techs., Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018)............................................................16

*Gonzalez v. Planned Parenthood of L.A.*,
  759 F.3d 1112 (9th Cir. 2014) ...........................................................................6

*In re Google Assistant Priv. Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020)........................................................22, 23

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. 2014) .................................................................21

*In re Google, Inc. Privacy Policy Litig.*,
  58 F. Supp. 3d 968 (N.D. Cal. 2014)................................................................23

*Greco v. State*,
  347 Md. 423 (1997)..........................................................................................19

CARNIVAL'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT
3:23-cv-00236

*In re iPhone Application Litig.*,
 844 F. Supp. 2d 1040 (N.D. Cal. 2012) ............................................................ 15

*James v. Veros Credit, LLC*,
 2019 WL 13102877 (S.D. Cal. 2019), ............................................................. 24

*Knievel v. ESPN*,
 393 F.3d 1068 (9th Cir. 2005) ......................................................................... 4

*Konop v. Hawaiian Airlines, Inc.*,
 302 F.3d 868 (9th Cir. 2002) .......................................................................... 12

*Leocal v. Ashcroft*,
 543 U.S. 1 (2004) ........................................................................................... 19

*Licea v. Am. Eagle Outfitters, Inc.*,
 2023 WL 2469630 (C.D. Cal. 2023) ................................................................ 13

*Licea v. Cinmar, LLC*,
 2023 WL 2415592 (C.D. Cal. 2023) ................................................................ 13

*Low v. LinkedIn Corp.*,
 900 F. Supp. 2d 1010 (N.D. Cal. 2012) ...................................................... 22, 23

*Martin v. Sephora USA, Inc.*,
 2023 WL 2717636 (E.D. Cal. 2023) ................................................................ 13

*McNemar v. The Disney Store, Inc.*,
 91 F.3d 610 (3d. Cir. 1996) ............................................................................ 22

*In re Meta Pixel Healthcare Litig.*,
 2022 WL 17869218 (N.D. Cal. 2022) ............................................................ 7, 21

*Noe v. Sex Offender Registry Bd.*,
 2017 WL 1275358 (Mass. Super. 2017) ........................................................... 19

*NovelPoster v. Javitch Canfield Group*,
 140 F. Supp. 3d 938 (N.D. Cal. 2014) ............................................................. 13

*Osprey Portfolio, LLC v. Izett*,
 620 Pa. 274 (2013) ......................................................................................... 18

*Pena v. GameStop, Inc.*,
 2023 WL 3170047 (S.D. Cal. 2023) ............................................................ 7, 12

CARNIVAL'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT
3:23-cv-00236

*People v. Nakai*,
    183 Cal. App. 4th 499 (2010)...................................................................9

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1190 (N.D. Cal. 2014)....................................................8

*Popa v. Harriet Carter Gifts, Inc.*,
    426 F. Supp. 3d 108 (W.D. Pa. 2019) ...................................................22

*Poulsen v. Dept. of Def.*,
    994 F.3d 1046 (9th Cir. 2021) ...............................................................19

*Rosenow v. Facebook, Inc.*,
    2020 WL 1984062 (S.D. Cal. 2020) ......................................................12

*Schreyer v. Chaplain*,
    416 Md. 94 (2010) .................................................................................18

*Silver v. Stripe Inc.*,
    2021 WL 3191752 (N.D. Cal. 2021) ........................................................8

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) .................................................................14

*Squeri v. Mount Ida Coll.*,
    2019 WL 2249722 (D. Mass. 2019)........................................................23

*In re Stevens*,
    15 F.4th 1214 (9th Cir. 2021) ................................................................18

*Svenson v. Google Inc.*,
    65 F. Supp. 3d 717 (N.D. Cal. 2014)...............................................16, 17

*Town of Boylston v. Comm'r of Revenue*,
    434 Mass. 398 (2001) ............................................................................18

*Underhill v. Kornblum*,
    2017 WL 2869734 (S.D. Cal. 2017) ................................................12, 13

*United States v. Steiger*,
    318 F.3d 1039 (11th Cir. 2003)..............................................................13

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) .....................................................................24, 25

*In re Vizio, Inc. Consumer Privacy Litig.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017)......................................................12, 13

*Wheatley v. Massachusetts Insurers Insolvency Fund*,
    456 Mass. 594 (2010) ..........................................................................................19

*In re Zynga Privacy Litig.*,
    750 F. 3d 1098 (9th Cir. 2014) ...........................................................................15

**Statutes**

18 U.S.C. § 1030.................................................................................1, 24, 25

18 U.S.C. § 2016...........................................................................................7

18 U.S.C. § 2510............................................................1, 7, 14, 15, 17, 19

18 U.S.C. § 2511.............................................................7, 8, 12, 20, 21

18 U.S.C. § 2512..........................................................................................18

Cal. Penal Code § 630 ..................................................................................1

Cal. Penal Code § 631 ...............................................................7, 8, 12, 15

Mass. Gen. Laws Ann. ch. 272, § 99...................1, 8, 12, 14, 17, 18, 19

Md. Code Ann., Cts. & Jud. Proc. § 10-401.................................14, 17, 19

Md. Code Ann., Cts. & Jud. Proc. § 10-402....................................1, 8, 12

Md. Code Ann., Cts. & Jud. Proc. § 10-403....................................18

18 Pa. Stat. § 5701 .......................................................................................1

18 Pa. Stat. § 5702 ....................................................................14, 17, 19

18 Pa. Stat. § 5703 .....................................................................................12

18 Pa. Stat. § 5704 ......................................................................................8

18 Pa. Stat. § 5705 .....................................................................................18

**Rules**

Fed. R. Civ. P. 12(b)(6) ...............................................................................6

CARNIVAL'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT
3:23-cv-00236

**Other Authorities**

https://www.carnival.com/about-carnival/legal-notice/privacy-notice ................. 4, 5

Webster's Third New International Dictionary of the English
    Language Unabridged 618 (2002) ...................................................................... 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Carnival, the world's largest leisure travel company, maintains a website at carnival.com, which allows visitors to learn about Carnival's offerings, plan vacations, and book cruises. To improve website visitors' experiences, Carnival is alleged to use a Microsoft software tool called Clarity, which allows Carnival to track its users' interactions with carnival.com, including mouse movements, text entry, and scrolling. ECF No. 22 ("FAC") ¶¶ 51-53. This helps reveal to Carnival if there are certain pages, or parts of pages, that are causing users confusion or frustration. In fact, this is exactly why Clarity and tools like it are employed not just (as the FAC alleges) on carnival.com, but on a broad array of websites across the Internet.

This lawsuit alleges that Carnival's use of Clarity constituted unlawful recording of Plaintiffs' interactions with carnival.com without their consent. *See* FAC ¶ 64. Specifically, Plaintiffs allege that at some unspecified time in the past, they visited carnival.com, "us[ed] their mouse to hover and click on certain links and items," and entered basic record information (like name, address, and phone number) to book trips. FAC ¶¶ 5-9, 68. Carnival, Plaintiffs claim, captured that information (as well as device and browser types) with Clarity, and in so doing violated a federal criminal statute and various state analogues, enacted in the 1960s and 1970s to prohibit wiretapping of telephone and telegraph lines, as well as the federal criminal prohibition on hacking. *See* Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*; Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. Stat. §§ 5701, *et seq.*; Md. Code Ann., Cts. & Jud. Proc. § 10-402; Mass. Gen. Laws Ann. ch. 272, § 99; Computer Fraud and Abuse Act, 18 U.S.C. § 1030; FAC ¶¶ 64, 106. Plaintiffs also allege that when Carnival used Clarity to record their interactions with its website, it violated those same states' statutory and common-law prohibitions on invading another's privacy. FAC ¶ 64. On these bases, Plaintiffs seek statutory

damages of at least $1,000 for every individual who ever visited carnival.com.

Unsurprisingly, the law does not support Plaintiffs' assertion that every user of carnival.com is the victim of multiple crimes. The wiretapping laws apply only where a defendant (1) without consent (2) intentionally "intercepts" (3) the substantive "contents" of a communication (4) using a "device." Here, facts alleged in the FAC do not establish any of those elements, much less all: *First*, Plaintiffs consented to Carnival learning of their interactions with its website when they deliberately navigated to that site and used it to voluntarily provide Carnival with information—after being informed (immediately upon landing on the page) that their interactions were subject to tracking. *Second*, Plaintiffs fail to plead facts showing that Carnival "intercepted" their interactions with its website—that is, diverted the information while it was in transit from Plaintiffs' computers or smartphones to carnival.com, as opposed to learning of it from Plaintiffs' devices, *before* it could have left and/or been in transit. *Third*, the limited interactions that Plaintiffs engaged in on carnival.com do not constitute the kinds of substantive communication "contents" that the wiretapping laws were enacted to protect. *Fourth*, the snippets of Clarity software code that Carnival embedded in its website do not constitute a physical wiretapping "device" of the type that the wiretapping laws meant to outlaw when they were enacted in the 1960s and 1970s. Accordingly, an "increasing number of courts" have rejected lawsuits claiming that software like Clarity violates the wiretapping laws. *Cook v. Gamestop, Inc.*, 2023 WL 5529772, at *1 (W.D. Pa. 2023). Additionally, the caselaw has already considered—and rejected—Plaintiffs' suggestion that the use of technology like Clarity constitutes a "highly offensive" privacy invasion, as required to be actionable under the laws of all the states at issue here. And Plaintiffs do not even attempt to show how what Carnival is accused of doing here comes anywhere near a violation of the federal anti-hacking laws.

Every one of Plaintiffs' claims thus fails as a matter of law. The Consolidated Class Action Complaint should be dismissed in its entirety.

## II.     SUMMARY OF RELEVANT FACTS

### A.     Carnival Uses Microsoft's Clarity Tool to Improve Visitors' Experiences On Its Website.

Launched in 1972, Carnival is now the world's largest leisure travel company, operating Carnival Cruise Line—"The World's Most Popular Cruise Line®"—and offering voyages from every coast in the United States. Carnival's website, carnival.com, allows its visitors to search for cruises, plan and book travel, search for travel agents, and learn information about Carnival. Carnival continually seeks to improve visitors' experiences by identifying glitches or areas on its website that may interfere with the user experience. To do so, Carnival sometimes requires information about visitors' interactions with its website (e.g., where users are getting lost, confused, or stuck). To that end, Plaintiffs allege that Carnival contracted with Microsoft to receive access to a software tool known as "Clarity." *See* FAC ¶ 51. Specifically, Clarity comprises "snippets of JavaScript computer code," which Plaintiffs claim Carnival embedded into carnival.com. *See* FAC ¶¶ 1, 61.

### B.     The Clarity Tool Can Track Mouse Clicks, Mouse Gestures, And Keystrokes To Improve Website Visitors' Experiences.

The Clarity tool, sometimes called "Session Replay Code" in the FAC, allows a website owner to track mouse clicks and movements, scrolls, forms, and other interactions on its website. FAC ¶ 53. The tool is customizable, allowing its users to "mask[] sensitive information collected from a user's interactions with a website" so that it will not be recorded. FAC ¶ 56. One of Clarity's "standard" settings, for instance, allows the website owner to mask "all text entered by a user." *Id.* Clarity also enables websites to "customiz[e] the standard masking approaches" by "select[ing] specific elements and content to mask." *Id.* Clarity can take this data and combine it with other information from the owner's website to make a "simulation video of how a user interacts with a website." FAC ¶ 54. Note that this is *not* a video *recording* of the user's interactions; rather it is an illustration, recreated from the

specific data Clarity collects. *See id.* Additionally, by aggregating mouse clicks, gestures, and other interactions from a large sample of website visitors, Clarity allows a website owner to see—via "heatmaps"—where on its website users may experience issues that interfere with the user experience. FAC ¶ 55.

### C.   Carnival's Privacy Notice Tells Visitors When and How Carnival Collects Information.

Carnival discloses to website visitors the information it collects, including through the Clarity tool. Specifically, Carnival's Privacy Notice informs visitors it may collect data on carnival.com and through its applications:

> This Privacy Notice applies to our websites and applications, including Carnival.com … and ***describes how we collect, use and process your personal information in connection*** with our Sites, marketing and promotional activities and your interactions with us before, during and after one of our vacation experiences (collectively with our Sites, our "Services").

*See* https://www.carnival.com/about-carnival/legal-notice/privacy-notice (emphasis added).[1] The Privacy Notice also informs visitors of the types of information Carnival may collect, including "pages you visit, the links you click, the ads you view and click on, videos you watch, purchase information and your checkout process, and other similar actions." *Id.* It also discloses that Carnival may "use third-party tools to collect information you provide to us or information about how you use the Service and may record your mouse movements, scrolling, clicks and keystroke activity on our Sites and other browsing behavior," and that Carnival does so "to improve your customer experience" and that it may use it to "monitor the effectiveness of our Service," "perform analytics and detect usage patterns on our Service," "diagnose or fix technology problems," and "detect or prevent fraud or other harmful activities."

---

[1] Because Plaintiffs' FAC "depends on the contents of" carnival.com, "the incorporation by reference doctrine" allows the court, when evaluating Carnival's motion to dismiss, to consider Plaintiffs' allegations "in the context" of the full website. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

*Id.* Importantly, the Privacy Notice reminds users that by "using our Services" they "acknowledge that [they] have read, understood and agree to the terms of this Privacy & Cookies Notice." *Id.*

Visitors can access the Privacy Notice on carnival.com. When a visitor first lands on the website, a blue pop-up banner titled "Cookie Policy" immediately overlays the bottom of the visitor's browser window, and informs the visitor that Carnival captures information about the user's visit to "analyze our traffic":



*See* ECF No. 18-2.[2] The underlined language in the pop-up banner invites the user to read more links to the Privacy Notice itself. The pop-up banner persists at the bottom of the carnival.com website as a visitor navigates the site, even if they click through different pages. The banner persists even after the visitor clicks the Privacy Notice; it does not disappear until the visitor affirmatively closes it by clicking the "x" on the upper-right-corner of the banner. Even after the user closes the pop-up banner, a link to the Privacy Notice is available through a hyperlink contained in a blue bar across the bottom of the website.

---

[2] The exact formatting of the banner shown above has varied over time, though not in any material way. Because Plaintiffs do not specify when they supposedly visited carnival.com, *see* FAC ¶ 65, is it impossible to be sure exactly which version of the banner they saw during their visit. To the extent Plaintiffs believe that the version they saw differed in a material way from the one pictured above, Carnival invites them to explain how and why they think that difference matters.

**D.**    <u>**Plaintiffs Use Carnival's Website To Provide Carnival With Information, Then Sue Carnival For Keeping Track Of That Same Information.**</u>

Plaintiffs claim to have "visited carnival.com and certain of its subpages on their computers and/or smartphones," FAC ¶ 65, to "request[] and submit[] information related to" planning trips, FAC ¶¶ 5-9. Specifically, Plaintiffs claim to have disclosed their "location, intent to travel, dates of travel, travel locations as well as other personal data requested to book travel plans, such as passport number, driver's license number, date of birth, home address, phone number, email address, and/or payment information." *Id.* Nevertheless, despite interacting with carnival.com specifically for the purpose of providing such information to Carnival, and receiving other information in exchange, Plaintiffs claim to have been wholly unaware that Carnival would be keeping track of those interactions or the information they conveyed. *See* FAC ¶ 67. On that basis, Plaintiffs sued Carnival alleging that it "unlawfully intercept[ed] [their] communications" "any time they visit[ed] Defendant's website with Session Reply Code enabled." FAC ¶ 134. They also claim that this same conduct invaded their privacy in a way that was "highly objectionable" and "an egregious breach of … social norms," FAC ¶ 129, and constituted a criminal hack of Plaintiffs' devices, FAC ¶ 106.

### III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). While a court must accept all material factual allegations as true, it is not required to accept as true any allegations that are contradicted by matters that are subject to judicial notice, that are exhibits to a complaint, or that are incorporated by reference in a complaint. *See, e.g.*, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014).

## IV.    LEGAL ARGUMENT

### A.    Plaintiffs Fails To State A Wiretapping Claim (Counts I, III, V, VII & IX).

Although Plaintiffs bring claims under five separate wiretapping statutes, each of those statutes is analogous to (or is) the Federal Wiretap Act, which makes it a crime to "intentionally intercept[]"—i.e., to use an "electronic, mechanical, or other device" to "acqui[re] the contents of," 18 U.S.C. § 2510(4)—any "wire, oral, or electronic communication," 18 U.S.C. § 2511(1).[3] Accordingly, the elements of each of the five wiretapping claims here largely track those of the Federal Wiretap Act: namely, that the defendant (1) acting without consent "(2) intentionally intercepted (3) the contents of plaintiffs' electronic communications (4) using a device." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *10 (N.D. Cal. 2022) (numbering altered). Here, Plaintiffs fail to plead facts establishing any of those elements.

#### 1.    *Plaintiffs fail to plead facts showing that Carnival acted without consent.*

Each of the wiretapping statutes at issue here applies only when the defendant

---

[3] *See, e.g.*, *Pena v. GameStop, Inc.*, 2023 WL 3170047, at *3 (S.D. Cal. 2023) ("'The analysis for a violation of CIPA [Cal. Penal Code § 631] is the same as that under the federal Wiretap Act.'"); *Com. v. Blystone*, 519 Pa. 450, 464-65 (1988) ("[T]he Pennsylvania wiretapping statute is based on its federal counterpart, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2016."); *Davis v. State*, 43 A.3d 1044, 1051 (Md. 2012) ("[I]t is clear through both legislative history and case precedent that the federal wiretap statute … served as the guiding light for the Maryland Act; therefore, we read the acts in pari materia."); *Com. v. Vitello*, 367 Mass. 224, 251 (1975) ("[I]n substance the requirements of the Massachusetts statute are the same as those of Title III [the Federal Wiretap Act], as the legislative history of Title III shows that they should be.").

acts *without* consent.[4] Courts have been clear that consent, in this context, need not be express, but may instead be implied by the surrounding circumstances—such as when a person "leav[es] a message on an ordinary answering machine," or continues with a phone call "following [a] warning that the call 'may be monitored or recorded.'" *Commonwealth v. Byrd*, 235 A.3d 311, 319-20 (Pa. 2020); *see also, e.g.*, *Briddell v. State*, 2016 WL 4698158, at *4 (Md. Ct. Spec. App. 2016) (similar). As long as "the person being recorded knew or should have known, that the conversation was being recorded" it is not unlawful to record them. *Byrd*, 235 A.3d at 319.[5]

---

[4] 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception"); Cal. Penal Code § 631(a) (making it a crime to intercept a communication only "without the consent of all parties to the communication"); 18 Pa. Stat. § 5704(4) ("It shall not be unlawful … [for a] person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception."); Mass. Gen. Laws Ann. ch. 272, § 99(B)(4) ("a person given prior authority by all parties to such communication" may intercept it without liability); Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3) ("It is lawful under this subtitle for a person to intercept a wire, oral, or electronic communication where the person is a party to the communication and where all of the parties to the communication have given prior consent.").

[5] *See also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014) ("[C]onsent [under the Wiretap Act] may be implied where there are surrounding circumstances indicating that the defendant knowingly agreed to the surveillance."); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4 (N.D. Cal. 2021) (consent under Cal. Penal Code § 631(a) will be found where "a reasonably prudent user would have been

"[A]ctual knowledge" of the recording is not required; so long as a "reasonably intelligent person" would have understood that the recording was happening, there is no wiretapping violation. *Id.* at 319-20; *see also supra* n.5.

Accordingly, even "the very act of sending a communication over the Internet" can provide "express[] consent[] to the recording of the message," because an "objective[ly] reasonable person" would understand that such communications are, by their nature, subject to recording. *Byrd*, 235 A.3d at 320 (quoting *Commonwealth v. Cruttenden*, 58 A.3d 95, 98 (Pa. 2012)); *see also, e.g.*, *People v. Nakai*, 183 Cal. App. 4th 499, 518 (2010) (nature of internet communication is such that a person should "reasonably expect that the communication may be overheard or recorded"). After all, when a person interacts with a website, the natural assumption—indeed, the expected behavior—is that the website will keep track of those interactions. That is how websites adapt to user preferences, allow users to resume interactions that they began during previous sessions, and provide support to users who are encountering difficulties. Indeed, it is hard to imagine how the modern internet would function if websites were *not* keeping track of how users interacted with them.

Plaintiffs thus consented to Carnival's tracking of their interactions with its website, by continuing to use carnival.com in a circumstance where any "reasonably intelligent person," *Byrd*, 235 A.3d at 319-20, would have understood that her interactions with the website were being recorded. As an initial matter, Plaintiffs here were not just engaging in interactions "over the Internet," *Cruttenden*, 58 A.3d at 98, they were using those internet interactions to actively share information with Carnival. *See, e.g.*, FAC ¶ 8 (alleging that Plaintiff Rubridge intentionally "provided

aware" of the recording); *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) ("If recordings are not made 'secretly,' they do not constitute an interception[.]"); *Briddell*, 2016 WL 4698158, at *4 ("Briddell consented to the [recording] by continuing to speak after the 'this is being recorded' message[.]").

… personal information to Carnival, including his name, phone number, email address, trips that interested him, and departing port information"). Indeed, Plaintiffs intentionally provided information to Carnival via its website, with the specific expectation that Carnival would keep track of that information and use it to provide information back to Plaintiffs, to allow them to plan future trips. *See, e.g.*, FAC ¶¶ 5-9. It thus would have been not just surprising, but directly contrary to Plaintiffs' purpose, if Carnival had not been tracking their interactions with its website and the information those interactions conveyed. Accordingly, Plaintiffs' "very act" of sharing information with Carnival's website—which any "objective[ly] reasonable person" would know is subject to recording—necessarily means Plaintiffs "expressly consent[ed] to the recording of" the information shared. *Cruttenden*, 58 A.3d at 98.

But, it is more than just circumstances of the interaction from which consent can be implied. Carnival also provided specific notice that Plaintiffs' interactions with its website were subject to tracking. Indeed, as shown above, *see supra* § I.C, immediately upon landing on carnival.com Plaintiffs would have been presented with a prominent cookie banner, informing them that carnival.com "use[s] cookies to personalize content and ads, to provide social media features and to analyze our traffic." At the end of that short disclosure was a link to learn more, which if clicked would have taken Plaintiffs to the carnival.com Privacy Notice. This was not some elusive link buried at the bottom of the page or hidden in obscurity. Rather, it would have persisted at the bottom of carnival.com until Plaintiffs affirmatively closed the notice by clicking the "X" in its upper right-hand corner. Indeed, until Plaintiffs did so, the banner would have continued to follow them as they navigated carnival.com, reminding them that a Privacy Notice existed and where they could find it.

As for the Privacy Notice, it specified the type of information that carnival.com may collect, including: "pages you visit, the links you click, the ads you view and click on, videos you watch, purchase information and your checkout process, and other similar actions." *See supra* § I.C. Further, the Privacy Notice stated that

CARNIVAL'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT
3:23-cv-00236

Carnival may engage outside companies like Microsoft to assist with data collection and analysis. *Id.* Importantly, the Privacy Notice reminds users that by "using our Services" they "acknowledge that [they] have read, understood and agree to the terms of this Privacy & Cookies Notice." *See id.*

All of this thus belies Plaintiffs' conclusory allegations that they "did not consent to any of Carnival's actions in intercepting, reading, and learning the contents of their communications," that "Carnival's website does not put Plaintiffs on notice of or disclose, in any way, its use of Session Replay Code," and that "website users can interact with Carnival's website without ever reviewing or agreeing to the terms of any purported privacy policy Carnival may have." FAC ¶¶ 70, 115; *see Iqbal*, 556 U.S. at 678 (conclusory allegations generally need not be credited); *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052, n.1 (9th Cir. 2023) (especially where they are contradicted by evidence incorporated by reference into the complaint). Between the fact that they were interacting over the internet generally, providing information to Carnival specifically through its website, and doing so after being presented with the prominent disclosures on carnival.com's banner—which appeared immediately upon Plaintiffs' arrival at www.carnival.com—Plaintiffs (or at least a reasonably intelligent person in their position) would have been aware from the jump that Carnival would be keeping track of their interactions on its website. And so by continuing to use that website in spite of that knowledge (actual or constructive), Plaintiffs consented to exactly the acts they describe in their FAC.

For this reason alone, their wiretapping claims fail.

### 2. *Plaintiffs fail to plead facts showing that Carnival "intercepted" a communication.*

Regardless of consent, the wiretapping laws at issue here apply only to a defendant who (among other things) "intercepted" a communication, 18 U.S.C.

§ 2511(1)[6]—*i.e.*, "acqui[red]" the communication "contemporaneous with [its] transmission." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002). Accordingly, to survive a motion to dismiss, a wiretapping claim must allege facts showing that the defendant read or acquired the communication while it was en route to its destination—not before it left or after it had already arrived. *See, e.g.*, *Pena v. GameStop, Inc.*, 2023 WL 3170047, at *6 (S.D. Cal. 2023) (dismissing wiretapping claims for failure to plead facts showing "that the communications in question were acquired 'in transit' such that they were 'intercepted'"); *Rosenow v. Facebook, Inc.*, 2020 WL 1984062, at *7 (S.D. Cal. 2020) (similar); *Underhill v. Kornblum*, 2017 WL 2869734, at *5 (S.D. Cal. 2017) (similar). Conclusory assertions that merely recite that the communications were acquired "during transmission" or "in real time" are insufficient. *See In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1228 (C.D. Cal. 2017) (dismissing wiretapping claim because allegations that defendant "intercepted their communications … 'during transmission'" were too conclusory). Rather, a complaint must "articulate[] with sufficient clarity when [defendant] supposedly intercepted their communications." *Id.*

Courts have explained, however, that interception is inimical in cases involving electronic communications. That is because electronic communications "are not typically intercepted during transmission," but rather are almost always

---

[6] 18 Pa. Stat. § 5703(1) (making it a crime to "intentionally ***intercept***[] … any wire, electronic or oral communication" (emphasis added)); Md. Code Ann., Cts. & Jud. Proc. § 10-402 (making it a crime to "[w]illfully ***intercept*** … any wire, oral, or electronic communication" (emphasis added)); Mass. Gen. Laws Ann. ch. 272, § 99(C)(1) (making it a crime to "willfully commit[] an ***interception*** … of any wire or oral communication" (emphasis added)); Cal. Penal Code § 631 (making it unlawful to "read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is ***in transit***" (emphasis added)).

acquired either before the information leaves the sender's computer or after it arrives at the recipient's. *Martin v. Sephora USA, Inc.*, 2023 WL 2717636, at \*10 (E.D. Cal. 2023). Consider the example of an email: Suppose a person spends twenty minutes typing a draft email on her computer, before finally hitting the "Send" button, at which point the email is transmitted nearly instantaneously to the intended recipient's inbox, where it waits to be read. The only time when the email is "in transit" is during the "seconds or mili-seconds … following [the] send command" before it reaches the recipient's inbox. *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 938, 952 (N.D. Cal. 2014) (quoting *United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003)). The email is not "in transit"—and thus it is not a violation of the wiretapping laws to read the email's contents—during either the time before the writer pushes "Send" or the time after the email arrives at its destination. *See id.*

Plaintiffs here provide no well-pled factual allegations showing that Clarity accessed Plaintiffs' information while it was traveling to Carnival, as opposed to before it left Plaintiffs' devices or after it had reached its destination. The FAC is not saved by its bare assertions that Plaintiffs' "electronic communications are intercepted contemporaneously with their transmission," or "in real time." FAC ¶¶ 145-46, 178-79, 210-11. These allegations are indistinguishable from those that courts have already found lacking. *See Licea v. Cinmar, LLC*, 2023 WL 2415592, at \*10 (C.D. Cal. 2023) ("Plaintiffs must provide more than conclusory allegations that messages were 'intercepted in real time.'"); *Licea v. Am. Eagle Outfitters, Inc.*, 2023 WL 2469630, at \*9 (C.D. Cal. 2023) (same); *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d at 1228; *Underhill*, 2017 WL 2869734, at \*4.

To the extent Plaintiffs do provide factual allegations about how or when the purported acquisition occurred, they tend to affirmatively **refute** any suggestion that it occurred during transit. Plaintiffs allege, for instance, that the Clarity code that supposedly performed the recording "deploys on each website visitor's internet browser." FAC ¶ 1; *see also* FAC ¶ 30 ("Session Replay Code works by inserting

computer code onto each website user's electronic device"); *id.* ¶ 50 ("[T]he Session Replay Code then deploys on website users' browsers and runs in order to track and analyze website user interactions with www.carnival.com."). According to Plaintiffs, "the browser [then] follows the code's instructions by sending responses in the form of 'event' data to a designated server." FAC ¶ 30. That the code operates on the internet browser on the website visitor's computer necessarily means the code acts *locally*; that is, on Plaintiffs' devices *before* the information was transmitted to Carnival, and not (like a wiretap) on the wires in between. Plaintiffs confirm this when they allege that the Clarity code captures information *even if it is never sent to Carnival at all*. *E.g.*, FAC ¶ 35 (alleging that session replay code will record "if a user writes information into a text form field, but then chooses not to click a 'submit' or 'enter' button on the website"). In other words, Plaintiffs' own allegations make clear that the alleged interception *cannot* occur during transmission of the information, because the data *collection* occurs on the user's browser, even if the information is never transmitted at all. Plaintiffs have thus "plead[ed] [themselves] out of court, by alleging facts which show that [they] ha[ve] no claim." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 989 (9th Cir. 2001). For this separate reason, Plaintiffs' wiretapping claims all fail.

### 3. *Plaintiffs fail to plead facts showing that Carnival accessed the "contents" of any message.*

In addition to the requirements discussed above, the wiretapping laws at issue here impose liability only where a defendant "acqui[res] … the *contents* of any wire, electronic or oral communication." 18 U.S.C. 2510(4) (emphasis added).[7] "Contents"

---

[7] 18 Pa. Stat. § 5702 (requiring the "acquisition of the *contents* of any wire, electronic or oral communication" (emphasis added)); Md. Code Ann., Cts. & Jud. Proc. § 10-401(10) (same); Mass. Gen. Laws Ann. ch. 272, § 99(B)(4) (requiring the acquisition of "the *contents* of any wire or oral communication" (emphasis added)); Cal. Penal

means "information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8). Accordingly, a defendant violates the wiretapping laws only if it accesses the substantive contents of a message. *See, e.g.*, *In re Zynga Privacy Litig.*, 750 F. 3d 1098, 1106 (9th Cir. 2014) (affirming dismissal of wiretapping claim for failure to plead facts showing that "contents" were accessed). For that to be the case, two things must be true: (1) a plaintiff must have intended to convey a substantive message, and (2) an unauthorized party must have accessed (or attempted to access) that substance, and not mere "record information," like a person's name or address. *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) (holding, under the Federal Wiretap Act, that "data" that is "generated" without the communicative "intent of the user" cannot "constitute 'content' susceptible to interception").

The FAC, however, fails to plead facts showing that Carnival (or Microsoft) accessed the substantive "contents" of each Plaintiffs' communication—i.e., "the intended message conveyed by the communication." *In re Zynga*, 750 F. 3d at 1106. Plaintiffs allege generally that the "communicat[ions]" that were recorded were their "us[e] [of] their mouse to hover and click on certain links and items." FAC ¶ 68. But courts have squarely rejected that exact theory, explaining that "[n]avigating through a website's multiple pages is not the substance of a communication; it's an action taken to go to a digital location." *Cook*, 2023 WL 5529772, at *8. As such, mouse movements are nothing more than "the cyber analog to record information"—indeed, "these movements and clicks literally constitute a record of [a person's] movements within a digital space"—not protected by the wiretapping laws. *Id.*

Plaintiffs also claim that Carnival obtained non-communication information such as "the date a user visited the website, the device the user accessed the website

_____

Code § 631 (making it unlawful to "read[], or attempt[] to read, or to learn **the contents** or meaning of any message, report, or communication" (emphasis added)).

on, the type of browser the user accessed the website on, the operating system of the device used to access the website, [and] the country where the user accessed the website from." FAC ¶ 53. But none of that information indicates a substantive message that "Plaintiff[s] intended to communicate." *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1085 (N.D. Cal. 2018). To the contrary, those pieces of information reflect, at most, "data about [a] communication"—not the contents of the communication itself. *See id.* at 1084. Just as information about the "number from which [a telephone call] was made" says nothing about the message communicated during that call, *id.*, the device and browser that Plaintiffs used says nothing about any messages they sent while using that device and browser. Similarly, just as the finger movements used to dial a number on a telephone reveal nothing about the message communicated on the phone call, *see id.*, the mouse movements used to navigate around carnival.com reveal nothing about any message that Plaintiffs intended to communicate to Carnival.

In the few places where Plaintiffs get more specific about the information that was supposedly captured by Clarity, their allegations serve only to undermine their claims. Plaintiffs claim that they disclosed their "location, intent to travel, dates of travel, travel locations as well as … passport number, driver's license number, date of birth, home address, phone number, email address, and/or payment information." FAC ¶¶ 5-9. As an initial matter, however, while Plaintiffs maintain that they disclosed that information, they carefully—and conspicuously—avoid alleging that Clarity *captured* any of it (much less all of it). *See id.* That is reason alone to disregard this allegation. What is more, none of the information that Plaintiffs litany is the substantive contents of a message; rather, it is all routine "record information," no different from the "names," "addresses," "date[s]," "ID numbers[s]," *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 729 (N.D. Cal. 2014), and "'geographic location'" information, which has "'been deemed to be non-content information.'" *Gonzalez*, 305 F. Supp. 1078, 1085 (quoting *In re Carrier IQ, Inc.*, 78 F.Supp.3d 1051, 1082

(N.D. Cal. 2015)); *see also Cousin v. Sharp Healthcare*, 2023 WL 4484441, at *3 (S.D. Cal. 2023) (allegation that "payment information" was collected too conclusory to show that content was at issue); *Svenson v. Google Inc.*, 2015 WL 1503429, at *8 (N.D. Cal. 2015) ("purchase authorization," i.e., an intent to make a purchase, does not constitute actionable message "contents"). Plaintiffs thus fail to not allege any substantive message that they meant to communicate—much less one that was captured by Carnival or Microsoft—so their wiretapping claims also fail for this independent reason.

### 4.   *Plaintiffs fail to plead facts showing that Carnival used a "device" to accomplish the supposed interception.*

Independent of all the above requirements, the wiretapping laws at issue here also apply only where a defendant acquires the contents of a communication "through the use of any electronic, mechanical, or other device." 18 U.S.C. 2510(4).[8] "[E]lectronic, mechanical, or other device" is in turn defined to mean "any device or apparatus which can be used to intercept a wire, oral, or electronics communication." 18 U.S.C. § 2510(5). Plaintiffs' wiretapping claims are premised on the assumption that Microsoft's "Session Reply Code" is a "device" within the meaning of the statute. FAC ¶ 92. But the "proper definition" of a statutory term is a "[p]urely legal question." *Freeman v. Gonzales*, 444 F.3d 1031, 1037 (9th Cir. 2006). The fact that the FAC alleges that "[c]ode" is a "device," FAC ¶ 92, is thus immaterial; it is a legal

---

[8] This is true of the Federal law, along with Pennsylvania's, Maryland's, and Massachusetts's. 18 Pa. Stat. § 5702 (requiring the "acquisition of [a] communication through the use of any electronic, mechanical or other ***device***" (emphasis added)); Md. Code Ann., Cts. & Jud. Proc. § 10-401(3) (same); Mass. Gen. Laws Ann. ch. 272, § 99(B)(4) (requiring acquisition "through the use of any intercepting ***device***" (emphasis added)). California's wiretapping law does not include the device limitation, and so is not affected by this section of this brief.

conclusion for this Court to decide. *See Iqbal*, 556 U.S. at 678-79 (courts, even at the motion-to-dismiss stage, "are not bound to accept … a legal conclusion" as true). Here, statutory text and context both make clear that the wiretapping laws use the term "device" in a way that connotes a physical object, and hence excludes the computer code alleged by the FAC.

By using the term "device" without specifically defining it, the wiretapping laws direct courts to apply its ordinary meaning. *In re Stevens*, 15 F.4th 1214, 1217 (9th Cir. 2021) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *accord, e.g.*, *Osprey Portfolio, LLC v. Izett*, 620 Pa. 274, 283 (2013); *Town of Boylston v. Comm'r of Revenue*, 434 Mass. 398, 405 (2001); *Schreyer v. Chaplain*, 416 Md. 94, 108 (2010). And a "device," in common parlance, is "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." Webster's Third New International Dictionary of the English Language Unabridged 618 (2002); *see also Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 136 F.3d 819, 822 (D.C. Cir. 1998). That definition—and particularly, its references to "equipment" or "a mechanism"— connotes a physical object.

That straightforward reading is confirmed by the context in which the term "device" appears. The Federal, Pennsylvania, and Maryland wiretap laws, for instance, make it unlawful to (among other things) "manufacture[]," or "assemble[]," a "device" that is primarily used for wiretapping. 18 U.S.C. § 2512(1)(b); *accord* 18 Pa. Stat. § 5705(3); Md. Code Ann., Cts. & Jud. Proc. § 10-403(1). Massachusetts's law similarly regulates the "installation" of a device in various circumstances, including "mak[ing] a secret entry upon a private place and premises in order to install [such a] device." Mass. Gen. Laws Ann. ch. 272, § 99(F)(2)(g). While one could readily do all of those things to physical objects, it would be odd and inappropriate word choice—and in some cases, impossible—to apply those verbs to intangible software code. Similarly, to the extent the wiretapping laws provide

examples of "devices," they uniformly list only physical (not intangible) objects. Pennsylvania's law, for instance, expressly lists "an induction coil"—i.e., a physical coil of wire, that can pick up on telephone signals—as an example of a "device." 18 Pa. Stat. § 5702. Likewise, all the wiretapping laws at issue here include express carveouts that prevent liability from attaching to a "hearing aid or similar device" or "telephone … equipment"—indicating that the term "device" would otherwise (i.e., absent this carveout) target physical objects like hearing aids and telephone equipment. *See* 18 U.S.C. § 2510(5); 18 Pa. Stat. § 5702; Md. Code Ann., Cts. & Jud. Proc. § 10-401(4); Mass. Gen. Laws Ann. ch. 272, § 99(B)(3). Conversely, none of the laws at issue here give any indication that they were meant to apply to intangible objects like computer code.

The plain language of the relevant statutes thus compels the conclusion that the term "device" does not include intangible computer code. And because the "text is clear" that "ends" the matter. *Poulsen v. Dept. of Def.*, 994 F.3d 1046, 1051 (9th Cir. 2021); *Commonwealth v. Mock*, 656 Pa. 174, 183 (2019); *Greco v. State*, 347 Md. 423, 428 (1997); *Wheatley v. Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 601 (2010). But even if any ambiguity as to the scope of the wiretapping laws remained, because they are all criminal statutes, the rule of lenity would require that ambiguity to be resolved in favor of a narrower reading—i.e., one that excludes computer code from the statutes' scope. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (lenity applies to noncriminal applications of a criminal statute).[9] After all,

---

[9] *See also A.S. v. Penn. State Police*, 636 Pa. 403, 422 (2016) (relying on *Leocal* to strictly interpret ambiguity in non-criminal law); *Noe v. Sex Offender Registry Bd.*, 2017 WL 1275358, at *12 (Mass. Super. 2017) (applying the rule of lenity "to civil statutes where a 'violation of the statute may trigger criminal penalties'"), *aff'd*, 480 Mass. 195 (2018); *Bourgeois v. Live Nation Ent., Inc.*, 430 Md. 14, 37 (2013) (accepting premise that rule of lenity applied to civil application of criminal statutes).

basic due process considerations mean that a defendant should not be held to be a criminal unless it is crystal clear that his acts violated the law. Here, where the wiretapping statutes give no indication that they are meant to apply to intangible computer code—and every indication to the contrary—that means that the Court should not extend them beyond their text in that way.

Because Plaintiffs' wiretapping claims are all premised on Carnival's use of computer code, which does not constitute a "device" within the meaning of the wiretap laws, their claims fail for this independent reason.

5.   *Plaintiffs' Federal Wiretap Act claim separately fails because Carnival is a party to the communications.*

In addition to all the reasons above, Plaintiffs' Federal Wiretap Act claim further fails because Carnival was a party to the communications at issue. As courts have explained, the Federal Wiretap Act "contain[s] an exemption from liability for a person who is a 'party' to the communication." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) (citing 28 U.S.C. § 2511(2)(d)). That is because the Federal Wiretap Act requires consent from only "one of the parties to the communication," 28 U.S.C. § 2511(2)(d), and so if it is a party itself that is performing the wiretapping, has necessarily consented to its own actions. Here, Plaintiffs do not dispute that Carnival was a party to the communications. To the contrary, Plaintiffs themselves allege that the relevant "communications [were] with the Carnival website." FAC ¶ 1. Nevertheless, they insist that Carnival's "conduct falls outside the scope of [the party] exception[]" to the Federal Wiretap Act, because "the crime-tort exception to the [party] exception applies." FAC ¶ 98.

The crime-tort exception, however, has no application here. That exception states that a party can still be liable under the Federal Wiretap Act in the limited circumstance where the party acts "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or any State." 28 U.S.C. § 2511(2)(d). As that text indicates, the crime-tort exception applies only

if Plaintiffs can "show that the ***purpose*** for [Carnival's] interception was to injure plaintiffs tortiously." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at \*12 (emphasis added). It is thus not enough to show just that Carnival committed a wiretap (although, as explained above, Plaintiffs have not even done that); instead, Plaintiffs must plead facts showing that Carnival's ***aim*** in committing that wiretap was "'to perpetuate torts on millions of Internet users.'" *Id.* (quoting *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at \*18 n.13 (N.D. Cal. 2014) (Koh, J.)). Accordingly, if the facts simply suggest that "the defendant's primary motivation was to make money," as opposed to "injur[ing] plaintiffs tortiously," the "crime-tort exception to the Wiretap Act is inapplicable." *Id.* That is exactly the case here. The obvious motivation for capturing website visitors' interactions is to improve website performance, provide better customer service, and ultimately sell more cruises. And in fact, Plaintiffs themselves specifically allege that Carnival "used" the Session Replay Code "for commercial gain." FAC ¶ 97. Accordingly, the crime-tort exception does not apply, and Plaintiffs' Federal Wiretap Act claim is barred because Carnival was a party to the relevant communications.[10]

---

[10] Plaintiffs' conclusory assertion that "Carnival's primary purpose for deploying Session Replay Code was to secretly, and without permission or consent, collect swaths of data from website users," FAC ¶ 100, should be disregarded, as it is not a "well-pleaded factual assertion," but a conclusory allegation "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Just as important, Plaintiffs' conclusory assertion (even if it were credited) does not plead what would be required for the crime-tort exception to apply here—i.e., that Carnival's specific intent in utilizing Clarity was to commit a tort. In fact, Plaintiffs do not speak to Carnival's ultimate aim in deploying Clarity at all. Instead, they say only that Carnival meant to collect data. But that will be true of *every* Federal Wiretap Act defendant; after all, the act applies only to those who act "intentionally." 18 U.S.C. § 2511(1)(a). And so if

CARNIVAL'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT
3:23-CV-00236

1

**B.    Plaintiffs Fail to State an Invasion of Privacy Claim (Counts IV, VI, VIII & X).**

2

3    Plaintiffs' invasion of privacy (also called "intrusion upon seclusion") claims

4    have been directly rejected by the caselaw. Under every applicable state's law, such

5    a claim requires Plaintiffs to allege *inter alia* "conduct by the defendant that amounts

6    to a serious invasion of [a] protected privacy interest." *In re Google Assistant Priv.*

7    *Litig.*, 457 F. Supp. 3d 797, 829 (N.D. Cal. 2020).[11] And courts applying those states'

8    laws have been clear that what Plaintiffs accuse Carnival of here—"collecting [their]

9    keystrokes, mouse clicks, and PII"—"is simply not the type of highly offensive act

10   to which liability [for an intrusion upon seclusion claim] can attach." *Popa v. Harriet*

11   *Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 122 (W.D. Pa. 2019).

12   That is because to be "highly offensive" under the relevant laws, an act must

13   be "of the sort which would cause mental suffering, shame or humiliation to a person

14   of ordinary sensibilities." *Chicarella v. Passant*, 494 A.2d 1109, 1114 (Pa. Super.

15   1985). That is a high bar—even collection of "plaintiff's HIV status," *McNemar v.*

16   *The Disney Store, Inc.*, 91 F.3d 610, 622 (3d. Cir. 1996), or "disclosure of personal

17   information, including social security numbers," does not meet it. *Low v. LinkedIn*

18   Plaintiffs' conclusory assertion that Carnival acted with the aim of secretly collecting

19   data were enough to trigger the crime-tort exception, then that exception would apply

20   in *every* Federal Wiretap Act case—a result clearly rejected by the caselaw cited

21   above in text, which makes clear that the exception is narrow and rarely applicable.

22

23   [11] *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 122 (W.D. Pa. 2019);

24   *Branyan v. Sw. Airlines Co.*, 105 F. Supp. 3d 120, 126 (D. Mass. 2015) ("[T]o prevail

25   on a claim alleging an invasion of privacy, a plaintiff must prove that there was …

26   an unreasonable, substantial or serious interference with his privacy."); *see also*

27   *Demo v. Kirksey*, 2018 WL 5994995, at *3 (D. Md. 2018) ("Maryland and

28   Pennsylvania have adopted the same definition for intrusion upon seclusion.").

*Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012). "[C]ollection—and even disclosure to certain third parties—of" more anodyne personal information certainly falls well below the requisite threshold. *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d at 829-30; *see also In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 988 (N.D. Cal. 2014) (no intrusion claim based on collection and disclosure of users' data, including browsing histories); *Low*, 900 F. Supp. 2d at 1025 (no "highly offensive" invasion of privacy by disclosing users' browsing histories to third parties). That is especially so where the defendant acted with "legitimate countervailing business interests," because "obviously" the law "was not intended to prohibit" acts "which are reasonable or justified." *Squeri v. Mount Ida Coll.*, 2019 WL 2249722, at *2 (D. Mass. 2019), *aff'd*, 954 F.3d 56 (1st Cir. 2020).

Accordingly, where, as here, a defendant does nothing more than engage in "routine commercial behavior," it does not commit an invasion of privacy. *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 830; *see also Branyan*, 105 F. Supp. 3d at 126 (where "legitimate business reasons for the reasonable collection or dissemination" of information exist, the collection or dissemination is "not actionable"). That is because nothing about the mere tracking of mouse movements "to hover and click on certain links and items" on a cruise line website, FAC ¶ 68, would cause any reasonable person the mental suffering, shame, or humiliation required to state a claim for invasion of privacy. After all, nothing about browsing a (very popular) travel site is even remotely shameful or humiliating—or indeed, even particularly personal or private at all. Rather, what Plaintiffs accuse Carnival of doing—collecting innocuous information (name, address, telephone number), which Plaintiffs themselves freely shared with Carnival—happens on countless websites. And indeed, it happens for exceedingly justifiable reasons—to improve website performance and provide users with better service. Because the FAC has alleged no facts that mark Carnival's conduct as being particularly egregious, and certainly no facts rising even to the level of wrongful disclosure of Social Security Numbers or

HIV status, Plaintiffs' invasion of privacy claims fail.

### C.   Plaintiffs Fail to State a Computer Fraud and Abuse Act Claim (Count II)

To state a claim under the Computer Fraud and Abuse Act ("CFAA"), Plaintiffs must plead facts showing that Carnival **first** "intentionally acesse[d] a computer without authorization or exceed[ed] [its] authorized access, and thereby obtain[ed] … information from [the] protected computer," **and second** caused a "loss to 1 or more persons … aggregating at least $5,000 in value" or a "threat to public health or safety." 18 U.S.C. §§ 1030(a)(2)(C), 1030(c)(4)(A)(i)(I), (IV); *id.* § 1030(g). The FAC fails both of those requirements.

#### 1.   *Plaintiffs fail to plead facts showing that Carnival exceeded its authorized access to Plaintiffs' computers.*

The FAC is unclear as to what, exactly, its theory is as to how Carnival supposedly accessed Plaintiffs' computers. The only allegation it includes on that question is the conclusory assertion that "Defendant exceeded, and continues to exceed, authorized access to the Plaintiffs' … protected computers and obtained information thereby." FAC ¶ 106. But that "merely parrots the language of the statute without providing any factual allegations," *James v. Veros Credit, LLC*, 2019 WL 13102877, at *2 (S.D. Cal. 2019), and thus runs headlong into the Supreme Court's admonition that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*, 56 U.S. at 662.

What is more, the FAC itself makes clear that Carnival did not access Plaintiffs' computers at all, much less in excess of their authorization. As the Supreme Court recently explained, to violate the CFAA the defendant must "obtain information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend." *Van Buren v. United States*, 141 S. Ct. 1648, 1659-60 (2021). Here, however, neither Carnival nor Clarity accessed any files, folders, or databases on Plaintiffs' computers; instead, the FAC alleges the "Carnival installed Session Replay Code *on its website*," FAC ¶ 125

(emphasis added)—i.e., on its own servers—and not on any device of Plaintiffs'. For this reason alone, Plaintiffs' CFAA claim fails.

2.   *Plaintiffs fail to plead facts showing that Carnival caused losses of at least $5,000 or created a threat to public safety*

In any event, Plaintiffs' CFAA claim separately fails because the FAC pleads no facts showing that Carnival's use of Clarity caused a "loss … aggregating at least $5,000 in value" or a "threat to public health or safety." 18 U.S.C. §§ 1030(a)(2)(C), 1030(c)(4)(A)(i)(I), (IV); *id.* § 1030(g). Plaintiffs' only theory as to how they suffered a $5,000 loss is that the information captured by Clarity was "never intended for public consumption." FAC ¶ 107. But the Supreme Court has recently made clear that a "loss" in the context of the CFAA includes only those "costs caused by harm to computer data, programs, systems, or information services." *Van Buren*, 141 S. Ct. at 1659-60. That is, it requires "technological harms—such as the corruption of files"—because those are "the typical consequences of hacking," and hence excludes intangible or other privacy harms like Plaintiffs allege here. *Id.*

Plaintiffs' argument that Carnival's use of Clarity poses "a threat to public health and safety," similarly fails.  Plaintiffs' argument is based on the misguided notion that they can state a claim because Carnival's use of Clarity fails to provide "adequate legal privacy protections." As courts have explained, that clause is rarely invoked, and for good reason: It applies only in the unusual case where "the access itself creates th[e] threat"—e.g., by "disabl[ing] computers or delet[ing] data essential to providing medical treatment, public utilities, or emergency response services"—and not where (as alleged here) "a third-party's foreseeable reaction to the unauthorized access creates the threat," such as through an exposure of supposedly private information. *Colo. Republican Comm. v. Doe*, 2016 WL 3922156, at *1-2 (D. Colo. 2016). For this separate reason, too, Plaintiffs' CFAA claim fails.

## V.   CONCLUSION

The Court should dismiss the FAC with prejudice.

1

Dated:        November 6, 2023        ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                              By: */s/ Jacob M. Heath*

4                                                    Jacob M. Heath

5                                              Attorneys for Defendant Carnival
                                               Corporation

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28